**VIETNAM VETERANS OF AMERICA, et al.**

v.

**SECRETARY OF THE NAVY, Appellant (Two Cases).**

**VIETNAM VETERANS OF AMERICA, et al., Appellants,**

v.

**SECRETARY OF THE NAVY.**

Nos. 86–5547, 86–5577, 86–5676.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 23, 1987.

Decided March 29, 1988.

---

Edward R. Cohen, Atty., Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen. and Douglas Letter, Atty., Dept. of Justice, Washington, D.C., were on the brief for Secretary of the Navy, appellant in Nos. 86–5547 and 86–5676 and appellee in No. 86–5577. Joseph E. diGenova, U.S. Atty., and William Kanter, Freddi Lipstein and Mary T. Koehmstedt, Attys., Dept. of Justice, Washington, D.C., also entered appearances for Secretary of the Navy.

Michael J. McDonald, with whom Barton F. Stichman, Washington, D.C., was on the brief for Vietnam Veterans of America, et al., appellees in No. 86–5577 and cross-appellants in Nos. 86–5547 and 86–5676. David F. Addlestone, Washington, D.C., also entered an appearance for Vietnam Veterans of America, et al.

Before BUCKLEY and WILLIAMS, Circuit Judges, and HOGAN,* District Judge.

Opinion for the Court filed by Circuit Judge WILLIAMS.

WILLIAMS, Circuit Judge:

Among the steps taken to address the problem of drug use in the armed forces in the early 1970s were two memoranda[1] issued by the Secretary of Defense or his deputy specifying more lenient standards for discharging members of the armed forces on less than honorable terms and providing for possible upgrading of prior drug-related discharges. We deal here with the Navy's handling of the memorandum governing upgrades. We find that its language is not specific or prescriptive enough to create rights or to bind agency discretion.

---

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

## I. BACKGROUND

The Department of Defense initiated its drug rehabilitation policy on October 23, 1970 with Directive 1300.11, establishing general "policies for preventing and eliminating drug abuse by personnel . . . and for restoring members of the armed forces so involved to useful functions." Brief for Appellant, Addendum A at 1. Eight months later, on July 7, 1971, Deputy Secretary of Defense David Packard amplified Directive 1300.11 with a memorandum here dubbed "the Packard Memorandum," which in pertinent part states that

> evidence developed by, or as a direct or indirect result of urinalyses administered for the purpose of identifying drug users may not be used in any disciplinary action under the Uniform Code of Military Justice or as a basis for supporting, in whole or part, an administrative discharge under other than honorable conditions. Similarly, a military member may not be subject to disciplinary action under the Uniform Code of Military Justice.

Brief for Appellant, Addendum B.

On August 13, 1971 then Secretary of Defense Melvin Laird issued what is here known as the Laird Memorandum, directing reconsideration of prior discharges in light of the Packard Memorandum. He wrote:

> Consistent with Department of Defense Directive 1300.11, October 23, 1970, and my memorandum of July 7, 1971 [the Packard Memorandum], concerning rehabilitation and treatment of drug users, administrative discharges under other than honorable conditions issued solely on the basis of personal use of drugs or possession of drugs for the purpose of such use will be reviewed for recharacterization.
>
> Accordingly, each Secretary of a Military Department, acting through his Discharge Review Board, will consider applications for such review from former service members. Each Secretary is autho-

---

**1.** One of them was later supplemented, but its extension does not materially alter the present case. *See* p. 531 *infra.*

rized to issue a discharge under honorable conditions upon establishment of facts consistent with this policy. Former service members will be notified of the results of the review. The Veterans' Administration will also be notified of the names of former service members whose discharges are recharacterized.

The statute of limitations for review of discharges within the scope of this policy will be in accordance with 10 United States Code 1553.[2]

This policy shall apply to those service members whose cases are finalized or in process on or before July 7, 1971.

Brief for Appellant, Addendum C. Laird issued a second memorandum eight months later, extending the policy to service members who received punitive discharges or dismissals resulting from court-martial sentences based on drug use or possession, *see* Brief for Appellant, Addendum A, but its terms do not materially change the character of the first memorandum, so far as it is here at issue. For simplicity we use the term Laird Memorandum to cover both.[3]

A word on the basic structure of the discharge procedure is in order. Three types of administrative discharge are available: (1) honorable; (2) general (under honorable conditions); or (3) under other than honorable conditions (previously labeled "undesirable"). *See* 32 C.F.R. Part 41, App. A, Part 2, C(2)(b) (1987).[4] Whether a service member receives an honorable, general, or undesirable discharge depends largely on the reason the member's service is terminated. *See* Brief for Appellant, Addendum D.

Discharges by the Department of the Navy may be reviewed by either or both of two administrative bodies: the Naval Discharge Review Board ("NDRB") and the Board for Correction of Naval Records ("BCNR"). The NDRB, which consists of five Navy officers, is empowered to review a discharge and recharacterize it "to reflect its findings." 10 U.S.C. § 1553(b). Any veteran seeking NDRB review is entitled to a hearing, *id.* § 1553(c), but a request for review must be made within 15 years of the date of discharge, *id.* § 1553(a).

The BCNR is a wholly separate body staffed by civilians. Its mandate—to correct any Navy record when "necessary to correct an error or remove an injustice," *id.* § 1552(a)—has been viewed as broader than that of the NDRB. *See Strang v. Marsh,* 602 F.Supp. 1565, 1570 (D.R.I.1985). Unlike the NDRB, it is not required to grant a hearing, *see id.* at 1570 (citing *Kalista v. Secretary of the Navy,* 560 F.Supp. 608, 616 (D.Colo.1983)). And "while in limited circumstances it will review a case not yet heard by a DRB, it typically hears cases where a DRB has already denied full relief." *Strang v. Marsh,* 602 F.Supp. at 1570. The statute of limitations for BCNR action is "three years after [a claimant] discovers the error or injustice...." 10 U.S.C. § 1552(b). However, the BCNR "may excuse a failure to file within three years after discovery if it finds it to be in the interest of justice." *Id.*

Department of Defense regulations identify two basic grounds for upgrade by the NDRB: impropriety or inequity in the discharge under review. *See* 32 C.F.R. § 70.9(b) & (c) (1987). As the court explained in *Strang v. Marsh:*

> Review for "propriety" looks to whether a discharge was illegal when it was given, or has effectively been rendered illegal by subsequent policy changes

---

**2.** 10 U.S.C. § 1553 (1982) provides that "a motion or request for review [of a discharge] must be made within 15 years after the date of the discharge.

**3.** The policies of Directive 1300.11 and the Packard and Laird Memoranda, are no longer in force, *see* Department of Defense Directive 1010.4 (August 25, 1980). The departmental policy today is to rid the military of drug abusers. For a description of the Navy's new policy of "zero tolerance" for drug or alcohol abuse,

*see Williams v. Secretary of the Navy,* 787 F.2d 552, 554–55 (Fed.Cir.1986).

**4.** At the time appellees were discharged, the present characterization of "discharged under other than honorable conditions" was denominated "undesirable discharge." Only the name of the characterization has been changed; the two characterizations have otherwise identical effect upon a former service member.

made expressly retroactive to the type of discharge at issue. [*See id.* § 70.9(b) ]. Review for equity looks to whether, considering all the factual circumstances surrounding an applicant's history and service record, as well as current service policy, an otherwise proper discharge ought to be upgraded as a matter of equity. [*See id.* § 70.9(c) ].

602 F.Supp. at 1571 n. 7. Although the Laird Memorandum's vagueness makes classification under these two heads a little treacherous, it ultimately appears to fit, if anywhere, within the notions guiding review for inequity.

The suit here was brought by two servicemen discharged from the Navy prior to the Laird Memorandum, Roosevelt L. Robinson and Jorge L. Fuentes, and by the Vietnam Veterans of America. The plaintiffs sue on behalf of the two individuals themselves and a class of former Navy and Marine personnel similarly situated. In essence they claim that the Laird Memorandum requires the Navy to upgrade all less than honorable discharges issued before July 7, 1971 and based solely on drug use or possession, regardless of any other evidence of misconduct found in the service members' records.[5]

Robinson sought an upgrade from the NDRB under the Laird Memorandum in September 1978, eight years after receiving an undesirable discharge. The NDRB in June 1979 denied recharacterization, stating that "the applicant raised no substantive issue concerning the propriety or equity of the discharge." Joint Appendix ("J.A.") at 642. The NDRB found that although Robinson's discharge preceded 1971 and was based solely on the possession of drugs, "there is sufficient aggravation, specifically the civil conviction and three non-judicial punishments, to fully justify that the discharge should not be recharacterized." *Id.* at 647.

On August 9, 1983 Robinson again asked the NDRB for recharacterization under the Laird Memorandum. Finding it appropriate to consider Robinson's service record as a whole, the NDRB again denied the upgrade, citing his civil conviction and non-judicial punishments, as well as his admitted constant drug use in a "hostile fire zone" and during sentinel duty while responsible for security. The Board concluded that "[i]t is clear from the wording of the memorandum, that recharacterization was not directed, but only that a review, with an eye to recharacterization if warranted, be conducted." *Id.* at 628.

Robinson then turned to the BCNR. It denied the petition in April 1985, taking a similar view of the Laird Memorandum— that while it "dictates that discharges such as [Robinson's] will be reviewed for recharacterization, it does not make recharacterization mandatory." *Id.* at 222. The Board emphasized that Robinson was "found in possession of dangerous drugs and marijuana on several occasions," had been "under the influence of drugs about 90% of the time while [he was] in Vietnam," and had "repeatedly volunteered for sentry duty at night and then used drugs while performing that duty and in doing so [he] willfully endangered the safety of [his] fellow Marines." *Id.* Accordingly, the BCNR concluded that the facts did not show "either a material error or an injustice" that would warrant an upgrade. *Id.* at 223.

Fuentes initially sought recharacterization from the NDRB on March 4, 1981, almost twelve years after receiving an undesirable discharge for the unauthorized use of drugs. The Board denied the request, finding the Memorandum inapplicable because Fuentes's records included preservice and in-service drug use and three "Article 15"[6] punishments within a five-month period for unauthorized absences totaling 20 days. *Id.* at 794. Fuentes then sought corrective action from the BCNR, which denied relief in August 1982. The

---

5. Appellees appear to concede that the decision of whether to upgrade a discharge to a fully honorable one is within the discretion of the Navy.

6. Article 15 of the Uniform Code of Military Justice permits limited punishments after findings of guilt made without judicial process, unless the accused demands trial by court-martial. 10 U.S.C. § 815 (1982).

BCNR found the Laird Memorandum did not apply because Fuentes's "service included infractions of the Uniform Code of Military Justice and illegal pre-service and in-service drug use; however, the approximate cause of [his] discharge was not drug related; therefore the Laird Memorandum does not apply in your case." *Id.* at 178.[7] The BCNR said that it could find no mitigating circumstances to warrant recharacterization. *Id.*

Plaintiffs brought this suit in October 1985. The district court granted partial summary judgment in their favor, enjoining the Secretary of the Navy from refusing to upgrade the discharges of Robinson and Fuentes. It read the Laird Memorandum to require upgrade for any service member discharged less than honorably within the specified time span, if the discharge was formally based only on drug use or possession for personal use. *Id.* at 564–65. The court also granted class relief under the Memorandum, certifying an eligible class based on its reading of the Memorandum and ordering upgrade at least to General (under honorable conditions) for those qualifying under its theory. *Id.* at 573–74.

The plaintiffs' suit also asserted statutory and constitutional claims based on an alleged divergence between the Navy's reading of the Laird Memorandum and the Army's and Air Force's allegedly more expansive readings. They argued that the Navy's construction therefore violated 38 U.S.C. § 3103(e)(1) (1982), which refers to "published uniform standards" for issuance of upgrades, and the Fourteenth Amendment's guarantee of equal protection (as incorporated into the due process clause of the Fifth Amendment, *see Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954)). The district court denied plaintiffs' motion for summary relief on these claims.

The Secretary appealed the grant of individual and class relief, and the plaintiffs cross-appealed the judgment on the statutory and constitutional claims. The Secretary also moved to dismiss the appeal in this court on the ground that appellate jurisdiction of this case lies exclusively with the Federal Circuit.[8] We find jurisdiction in this court but reverse the judgment in favor of plaintiffs. On the cross-appeal we affirm.

## II. JURISDICTION

■ The Secretary's claim that jurisdiction lies in the Federal Circuit rests on the Federal Courts Improvement Act. 28 U.S.C. § 1295(a)(2) (1982). It provides that the Federal Circuit shall have exclusive jurisdiction of appeals from final decisions of a district court "if the jurisdiction of that court is based in whole or in part" on any of various provisions, including *id.* § 1346(a)(2). The latter is called the Little Tucker Act and is itself a part of the "Tucker Act." Little Tucker gives district courts concurrent jurisdiction with the Court of Claims over "[a]ny ... civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department," while the remainder of the Tucker Act gives the Court of Claims jurisdiction over similar claims without regard to jurisdictional amount. *Id.* § 1491; *and see Van Drasek v. Lehman*, 762 F.2d 1065, 1067 n. 1 (D.C.Cir.1985) (explaining components of the Tucker Act). Plaintiffs have in effect sought relief under the Little Tucker Act, says the Secretary, because an automatic consequence of upgrade is payment for leave accrued at the time of discharge. We reject the Secretary's claim.

■ Conceptually prior to his basic jurisdictional argument is a contention by the Secretary that the Federal Circuit rather than this court must decide the jurisdictional issue. His theory is that Congress sought by concentrating Little Tucker Act

---

7. We are at a loss to explain why the BCNR stated that Fuentes's discharge was not based on drug use—it clearly was. *See* J.A. at 804–05.

8. On January 20, 1987, a panel of this court ordered this motion referred to the panel that will consider the case on the merits. J.A. at 582.

appeals in the Federal Circuit to achieve a uniform body of law, and that attainment of that goal requires that only the Federal Circuit delineate the boundaries between its jurisdiction and that of the other circuits. Though fully recognizing the interest in uniformity, we do not believe that its accomplishment justifies the inconvenience that would result from creating an exception to the general principle that a federal court may determine its own jurisdiction. *See* 13 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3536 (1984 ed.); *United States v. United Mine Workers*, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947). Indeed, in two recent appeals this court has assessed for itself whether the case was linked to the Tucker Act in such a fashion as would oust the court of jurisdiction. *See Sharp v. Weinberger*, 798 F.2d 1521 (D.C.Cir.1986); *Van Drasek v. Lehman*, 762 F.2d 1065 (D.C.Cir. 1985). We proceed to the merits of the jurisdictional claim.

█ The Secretary appears to acknowledge that to be based on the Little Tucker Act a claim must be, at least in some sense, for money. It is equally clear that a claim is not for money merely because its success may lead to pecuniary costs for the government or benefits for the plaintiff. As the court noted in *Sharp v. Weinberger*, federal courts have entertained claims for equitable relief from allegedly unlawful employment decisions at least since *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed. 2d 1403 (1957). 798 F.2d at 1523. The 1976 amendments to the Administrative Procedure Act, Pub.L. No. 94–574, § 1, 90 Stat. 2721 (1976) (codified at 5 U.S.C. § 702 (1982)), satisfied whatever sovereign immunity problems such claims may have raised. Thus plaintiffs bringing such suits have no need of the Tucker Act's waiver of sovereign immunity.

Our past cases have spoken of claims as being based on the Little Tucker Act only where the plaintiff *sought* money, *Van Drasek*, 762 F.2d at 1068, or the district court *granted* money, *Sharp v. Weinberger*, 798 F.2d at 1524. Neither of these is present here. (There is a suggestion in

*Sharp* that there might be Little Tucker jurisdiction if the district court failed to grant money and the plaintiff objected to that failure on appeal (even though he originally sought no money), *id.,* but that scenario, which seems improbable, is certainly not presented here.) As plaintiffs sought and were granted only injunctive and declaratory relief, it would seem that their claim was not based on the Little Tucker Act.

The Secretary counters that a "direct, automatic, and unavoidable consequence of [an upgrade] will be payment for the leave accrued at the time of [appellees'] discharges." Reply Brief for Appellant at 4. But we reject any interpretation of the Federal Courts Improvement Act that would require us to resolve such an issue in order to determine our jurisdiction. Such inquiries would take us outside the record sought to be reviewed and thereby complicate the jurisdictional issue, uselessly so far as we can tell.

In *Sharp* we resoundingly rejected an analogous contention that we should look outside the record to resolve the jurisdictional issue. The government there argued that because plaintiff's claim included a request for costs and all other relief deemed just and proper, jurisdiction would be "based" in part on the Little Tucker Act if the district court could have granted monetary relief. We noted that the request was mere surplusage in light of the district court's duty under Fed.R.Civ.P. 54(c) to include the relief to which plaintiff was entitled even if the party did not demand the relief. We then refused to embark on the wholly peripheral inquiry that application of this theory would entail:

> Because we think it a permissible reading of the statutory language that a district court's jurisdiction is not based in whole or in part on the Little Tucker Act if the district court neither is asked to grant nor does grant any relief under that Act; and because no policy would be served and much time would be wasted by the investigation that the alternative reading would entail; we hold that the mere existence of the Rule 54(c) obli-

gation (and its reiteration in appellant's prayer for relief) [have no bearing on the jurisdictional issue].

798 F.2d at 1524. *See also Int'l Bhd. of Electrical Workers v. ICC*, 832 F.2d 91, 93 (7th Cir.1987) ("The chief and often only virtue of a jurisdictional rule is certainty.").

The *Sharp* rationale applies with equal force here. It would be foolish to impute to Congress an intent to require an appellate court to go outside the record to ascertain its own jurisdiction. Our bright line rule avoids this problem.

The government suggests that since payment of compensation for accrued leave is automatic, the suit is effectively one for money without—unless it be based on the Little Tucker Act—the necessary waiver of sovereign immunity. But plaintiffs' right to bring this suit derives from Congress's waiver of sovereign immunity for non-monetary claims in 5 U.S.C. § 702. That waiver logically encompasses any payment of accrued leave that results automatically from plaintiffs' prevailing.

As plaintiffs neither sought nor were awarded monetary damages, we have jurisdiction over this appeal.

■ In exercising jurisdiction in this case, we effectively allow a plaintiff to obtain review in a regional court of appeals, despite the Federal Courts Improvement Act, by the expedient of pursuing only his non-monetary claims. We do not decide whether such a strategy precludes a plaintiff from afterwards seeking monetary relief for the same claim under the Little Tucker Act, though that would appear to be the expected result under black letter principles. *See* 18 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4412, at 93–99 (1981).

We note that the circuits are in conflict over a similar issue posed by the requirement of the (Big) Tucker Act, 28 U.S.C. § 1491(a)(1), that a plaintiff seeking retrospective monetary relief of over $10,000 do so only in the Claims Court. In essence, the issue is whether such a plaintiff may also bring an equitable claim in district court. In *Massachusetts v. Secretary of HHS*, 816 F.2d 796 (1st Cir.1987), *cert.*

*granted*, —— U.S. ——, 108 S.Ct. 693, 98 L.Ed.2d 645 (1988), plaintiff brought both claims in district court, and the court of appeals transferred only the monetary claim to the Claims Court, retaining the equitable one. It expressly stated its assumption that plaintiff could use a victory in the equitable action affirmatively in the Claims Court, notwithstanding the claim-splitting. *Minnesota ex rel. Noot v. Heckler*, 718 F.2d 852 (8th Cir.1983), is to the same effect. *Compare Amoco Production Co. v. Hodel*, 815 F.2d 352, 367 (5th Cir.1987) (on somewhat similar facts, court of appeals transfers all claims to Claims Court), *petition for cert. filed*, No. 87–372; *New Mexico v. Regan*, 745 F.2d 1318, 1322 (10th Cir.1984) (same), *cert. denied*, 471 U.S. 1065, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985); *Portsmouth Redevelopment and Housing Auth. v. Pierce*, 706 F.2d 471 (4th Cir.) (same), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). *Compare also Matthews v. United States*, 810 F.2d 109, 112 (6th Cir.1987); *Keller v. Merit Systems Protection Board*, 679 F.2d 220, 223 (11th Cir.1982) (per curiam); *Denton v. Schlesinger*, 605 F.2d 484 (9th Cir.1979); *Cook v. Arentzen*, 582 F.2d 870, 878 (4th Cir.1978); *Carter v. Seamans*, 411 F.2d 767 (5th Cir.1969), *cert. denied*, 397 U.S. 941, 90 S.Ct. 953, 25 L.Ed.2d 121 (1970) (all refusing to permit government employees' splitting of backpay and reinstatement claims), *with Chabal v. Reagan*, 822 F.2d 349, 354 (3d Cir.1987); *Shaw v. Gwatney*, 795 F.2d 1351, 1356–57 (8th Cir.1986); *Smith v. United States*, 654 F.2d 50, 52 (Ct.Cl.1981) (all permitting splitting of backpay and reinstatement claims). This circuit has yet to settle the issue of splitting equitable and monetary claims, in either Tucker Act context. While *Dronenburg v. Zech*, 741 F.2d 1388 (D.C.Cir.1984), considered a reinstatement claim, plaintiff had brought no claim for backpay. As plaintiffs here also seek no monetary relief, we again need not address the issue.

## II. THE MERITS

The murky language of the Laird Memorandum lends itself to a vast range of

interpretations. We will first identify two polar notions and an intermediate one. Plaintiffs' view is that the Memorandum requires an upgrade unless the Navy at the time of discharge either (1) made findings of an alternative basis for discharge that would have been sufficient standing alone, or (2) at least brought charges of such an alternative basis.

At the opposite end is one of the Secretary's readings, namely that the Memorandum requires only that the review board *consider* recharacterization. As we saw, the dispositions of Robinson's and Fuentes's petitions reflected such a view. *See also* Brief for Appellant at 43; Reply Brief for Appellant at 16, 23. A variation on this theme is that denial of upgrade is proper if "aggravation" is present, as it clearly was for both plaintiffs. The NDRB sounded this theory in denying Robinson's upgrade request, referring to an opinion by the Navy's Judge Advocate General that the Laird Memorandum was "primarily a 'clemency' or 'mitigating' procedure, and that denials of such 'clemency' or 'mitigation' might well be proper and just in those cases in which significant matters in aggravation were present." J.A. at 628.

An intermediate position exists and seems at times to have been espoused by the Secretary. In its Memorandum in Support of its Motion to Dismiss or for Summary Judgment, the government states that the use of the word 'solely' "indicates that the Secretary of Defense was referring to discharges where the sole possible basis of discharge was drug use or possession." *Id.* at 62. This interpretation is supported by the government's constant attempts in its appellate brief to demonstrate that Robinson and Fuentes could have been discharged on bases other than personal use of drugs. *See, e.g.,* Brief for Appellant at 35–36. Though far more generous to service members than the Secretary's other position, this differs critically from plaintiffs' position in that a board could deny an upgrade even if the alternative grounds for less-than-honorable discharge had not been recorded either as formal charges or as findings.

The government's inability to nail down its position on the Memorandum points to the very problem in this case—the total lack of standards by which to judge compliance with the Memorandum. Before evaluating compliance we must decide whether the Memorandum creates any binding rule at all. This is an issue we have frequently considered in trying to distinguish rules from policy statements for purposes of the Administrative Procedure Act's requirement that agencies afford notice-and-comment procedures for the former but not the latter. 5 U.S.C. § 553 (1982). *See, e.g., McLouth Steel Products Corp. v. Thomas,* 838 F.2d 1317 (D.C.Cir.1988); *American Hospital Ass'n v. Bowen,* 834 F.2d 1037 (D.C.Cir.1987); *Community Nutrition Institute v. Young,* 818 F.2d 943 (D.C.Cir. 1987); *Telecommunications Research & Action Center v. FCC,* 800 F.2d 1181 (D.C. Cir.1986); *American Bus Ass'n v. United States,* 627 F.2d 525, 532 (D.C.Cir.1980); *Pacific Gas & Electric Co. v. FPC,* 506 F.2d 33 (D.C.Cir.1974). Basically, the line is drawn in terms of the extent to which the statement fails to "leave[ ] the agency and its decisionmakers free to exercise discretion," *McLouth Steel Products Corp. v. Thomas,* 838 F.2d at 1320 (quoting *Community Nutrition Institute v. Young,* 818 F.2d at 946), thereby having a binding effect or imposing rights or obligations.

Before examining whether the Laird Memorandum constitutes a non-binding policy or a substantive rule, we must address an ambiguity lurking in this area: whether an agency statement outside the context of adjudication could be binding without being a rule. Our dicta on the subject—and that is all we have found—have split. Some of our opinions have implied that the established maxim requiring agencies to adhere to their own rules, *see, e.g., Vitarelli v. Seaton,* 359 U.S. 535, 539, 79 S.Ct. 968, 972, 3 L.Ed.2d 1012 (1959); *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957), extends to policies or interpretive rules. *See, e.g., Padula v. Webster,* 822 F.2d 97, 100 (D.C.Cir.1987) ("Although the FBI has no published regulation governing what factors may be utilized in selecting a special agent, internal guidelines and rules

not formally promulgated have occasionally been held to bind agency conduct."); *Lucas v. Hodges*, 730 F.2d 1493, 1504 n. 20 (D.C. Cir.) ("it is a familiar principle of federal administrative law that agencies may be bound by their own substantive and procedural rules and policies, whether or not published in the Federal Register, if they are intended as mandatory"), *vacated as moot*, 738 F.2d 1392 (D.C.Cir.1984); *Doe v. Hampton*, 566 F.2d 265, 281 (D.C.Cir.1977) (remanding for determination of whether guidelines in Personnel Manual are "mandatory or precatory"); *Jolly v. Listerman*, 672 F.2d 935, 940–41 (D.C.Cir.), *cert. denied*, 459 U.S. 1037, 103 S.Ct. 450, 74 L.Ed. 2d 604 (1982); *Mazaleski v. Treusdell*, 562 F.2d 701, 717 n. 38 (D.C.Cir.1977).

Yet other cases suggest that a substantive agency statement cannot be binding on the agency if it is a mere policy statement or interpretive rule. In holding that the Secretary of Labor was not required to observe his department's mine safety enforcement guidelines, for example, we stated: "It is axiomatic that an agency must adhere to its own regulations, ... and that it need not adhere to mere "general statement[s] of policy[ ]." *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 536 (D.C.Cir.1986) (quoting *Pacific Gas & Electric Co. v. FPC*, 506 F.2d 33, 38 (D.C.Cir. 1974); (other citations omitted)).

■ In a recent case upholding an agency statement that was attacked for want of compliance with § 553, we alluded to some of the cases suggesting that an interpretive rule or policy statement might bind the agency, but concluded that it could not. "To the extent that the conflicting cases can be harmonized," we wrote,

> they seem to state no principle different from the one we have just stated in the text: the "binding" quality of a particular rule or statement will depend on whether the agency intended to establish a "substantive" rule, one which ... creates or modifies rights that can be enforced against the agency.

*National Latino Media Coalition v. FCC*, 816 F.2d 785, 788 n. 2. (D.C.Cir.1987).

We think this analysis represents a sound interpretation of earlier judicial statements implying that legislative rules bind the courts, while interpretive rules or policy statements do not. *See, e.g., Batterton v. Francis*, 432 U.S. 416, 424–26 & n. 9, 97 S.Ct. 2399, 2404–06 & n. 9, 53 L.Ed.2d 448 (1977) (while legislative rules "have the force and effect of law," "a court is not required to give effect to an interpretative regulation"); *Joseph v. United States Civil Serv. Comm'n*, 554 F.2d 1140, 1154 n. 26 (D.C.Cir.1977) ("Legislative rules have the full force of law and are binding on a court subject only to review under an arbitrary and capricious standard. Interpretative rules do not have the force of law and even though courts often defer to an agency's interpretative rule they are always free to choose otherwise."). Obviously the first part of such statements is far too broad: legislative rules are subject to judicial review and often do not survive. If the statement is modified to say only that "valid" legislative rules bind the courts and the agency, then—insofar as it refers to the *courts*—it is a mere tautology. But it makes sense to say that statements whose language, context and application suggest an intent to bind agency discretion and private party conduct—the sort of statements requiring compliance with § 553—will have that effect if valid; interpretive rules or policy statements will not, *regardless* of their validity. A binding policy is an oxymoron.

■ A non-binding but valid policy statement or interpretive rule may seem a contradiction in terms, but our cases make clear that such statements can affect an agency's decisionmaking. *See Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d at 537 (a policy may have " 'some substantive impact,' as long as it leave[s] the administrator free to exercise his informed discretion") (quoting *Guardian Fed. Sav. & Loan Ass'n v. Federal Sav. & Loan Ins. Corp.*, 589 F.2d 658, 666, 668 (D.C.Cir. 1978)). But the agency remains free in any particular case to diverge from whatever outcome the policy statement or interpretive rule might suggest. *See, e.g., Jolly v. Listerman*, 672 F.2d 935, 940–41 (D.C.Cir.

1982) (agency did not have to follow Personnel Manual as the relevant provision was "intended to be something less than a binding rule.... [Its] impact ... is clearly informative, perhaps precatory, but certainly not directive or mandatory."). In such a case, any affected private party is free to appeal to the agency for such a divergent result. *See McLouth*, 838 F.2d at 1324–25.

■ Before applying the above principles to the Laird Memorandum, we pause to note that our rule/policy exegesis is not inconsistent with the rule that agencies must follow their own procedures, *see Morton v. Ruiz*, 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974) (holding Bureau of Indian Affairs had to follow procedures set forth in its internal policy manual). Internal procedures, like policy statements, are exempt from the coverage of § 553. The exemption is quite independent of whether the procedures will be binding. For application of the exemption for policy statements, by contrast, courts must determine what types of *substantive* agency statements are to enjoy the "policy statement" exemption. As we have seen, they have done so on the basis of the agency's intent to be bound.

■ The Laird Memorandum cannot reasonably be classified as a binding statement. First, except for the provision requiring each Secretary *to consider* applications for recharacterization (of which more later), the language of the Memorandum is entirely precatory, not mandatory. For example, "[e]ach Secretary is authorized to issue a discharge under honorable conditions." The Memorandum does not even purport to set forth any standards governing when an upgrade may be granted or denied. Its language thus militates against an interpretation that the Memorandum was meant to make recharacterization automatic.

Second, interpretation of the Laird Memorandum as a flexible policy, as opposed to a binding rule, is consistent with the function of the NDRB and the BCNR. Both Boards exercise discretion on issues of equity by reviewing the individual merits of each application for upgrade on a case-by-case basis. *See* 32 C.F.R. § 70.9(b)(ii)(3) (1987) (NDRB); 10 U.S.C. § 1552(a) (boards of corrections may upgrade to "remove an injustice"). *See also Strang v. Marsh*, 602 F.Supp. 1565, 1571 n. 7 (D.R.I.1985) (NDRB "looks to whether, considering all the factual circumstances surrounding an applicant's history and service record, as well as current service policy, an otherwise proper discharge ought to be upgraded as a matter of equity.").

It is true that the underlying regulations require recharacterization where a "change in policy ..., made expressly retroactive to the type of discharge under consideration, requires a change in the discharge." 32 C.F.R. § 70.9(b)(ii) (1987). But the Laird Memorandum cannot qualify as such a change, and the plaintiffs are most explicit in repudiating any such view. They point out that compulsory urinalysis and drug treatment programs *started* with the Packard Memorandum. It then as an ancillary matter made special provisions for discharge—to assure those forced into urinalysis or lured into treatment that they would not find themselves dishonorably discharged as a result. The circumstances that under the Packard Memorandum justify lenient discharge simply did not exist at the period covered by the Laird Memorandum. Thus one cannot read Packard as a "change in policy ... made expressly retroactive" by Laird. Indeed, plaintiffs say, quite correctly, that the "intent of [the Laird Memorandum] was therefore not to provide 'equal treatment' or to make the Packard Memorandum retroactive." Opening Brief for Cross–Appellant at 33.

The only provision of the Laird Memorandum that plausibly could have been intended to create a binding right is the provision directing the Secretary to consider applications for recharacterization. Plaintiffs suggest that such a reading makes the Memorandum superfluous, since such review was already available. The regulations governing upgrades when the Memorandum was promulgated, however, seem to have vested less discretion in the NDRB to grant upgrades on an equitable basis than the regulations now in existence.

*Compare* 32 C.F.R. § 724.15(e)(4) (1971) (authorizing upgrade when discharge was originally improper or inequitable under standards of naval law and discipline existing at the time or standards made expressly retroactive to the type of discharge) *with* 32 C.F.R. § 70.9(c)(ii)(3) (1987) (authorizing upgrade when "it is determined that relief is warranted based upon consideration of the appellant's service record and other evidence presented to the DRB viewed in conjunction with [a broad range of factors], even though the discharge was determined to have been otherwise equitable and proper at the time of issuance"). Thus, the Memorandum may have been intended only to *authorize* upgrades for service members discharged for drug use.[9] Alternatively, assuming there was no doubt about the legal availability of such upgrades, the Memorandum's purpose must have been exhortation only: to encourage more lenient treatment of such service members by the review boards. Nothing in the Memorandum or the history surrounding its creation suggests that the Department of Defense meant to mandate anything more than the process of review.

Finally, there is no evidence in the record that the Secretary has ever applied the Laird Memorandum in an inflexible fashion or used it to limit significantly the review boards' discretion over upgrades. Thus, language, context and agency treatment all point toward the same classification.

Under this view of the Laird Memorandum, our decision in *Giles v. Secretary of the Army*, 627 F.2d 554 (D.C.Cir.1980), on which plaintiffs have heavily relied, is plainly irrelevant. *Giles* dealt with service members whose less-than-honorable discharges were based on compulsory urinalyses; the Army had adopted a decision of the Court of Military Appeals to the effect that such discharges were improper. Accordingly, the court found that upgrades for persons so discharged were mandatory. It found a limited exception where the Army had brought other charges in the original discharge proceeding; in such in-

stances, it could deny upgrade if it prevailed on the residual charges. Here, however, even plaintiffs concede that their "initial discharge and discharge characterization decisions *were perfectly proper* at the time they were made." J.A. at 121–22 (emphasis in original). As the Laird Memorandum did nothing retroactively to invalidate those discharges, *Giles* does not apply.

Although we hold that the Laird Memorandum has no binding effect, Navy action thereunder-establishing a pattern of granting upgrade under specific circumstances and relying on the Memorandum for support, for example—might give rise to an obligation to explain a sudden reversal. *See Telecommunications Research & Action Center v. FCC*, 800 F.2d 1181, 1184 (D.C.Cir.1986) ("When an agency undertakes to change or depart from existing policies, it must set forth and articulate a reasoned explanation for its departure from prior norms."). But the Memorandum itself seems to us too vague to impose a duty of explanation standing alone.

As we find the Laird Memorandum to be without binding effect, we reverse the order of the district court granting relief on plaintiffs' first claim.

■ In their second and third claims, plaintiffs argue that the Navy's interpretation of the Laird Memorandum fundamentally differs from the Army's and the Air Force's interpretation. They claim that this alleged deviation violates 38 U.S.C. § 3103(e)(1) (1982), which states that no benefits are to be paid as a result of an upgrade except where based on review "of all the evidence and factors in each case under published uniform standards." They also claim it violates the equal protection component of Fifth Amendment due process.

The district court correctly found that genuine issues of material fact required it to deny plaintiffs' motion for summary judgment on these claims. Their supporting evidence consists of a random sample

---

**9.** If the Laird Memorandum is read as purporting to "bind" the agency to a broader basis for upgrades, then its adoption without notice-and-comment likely violated 5 U.S.C. § 553, but there would probably be no one with standing to object.

of the Army's and the Air Force's discharge recharacterization cases, purporting to prove that the Army and the Air Force interpret the Laird Memorandum to mandate an upgrade when the sole basis given for a discharge was personal drug use or possession of drugs for such use. Appellant submitted evidence to the contrary in the form of affidavits of the President of the Army's DRB and the Chief of the Air Force's DRB. Reviewing the record in the light most favorable to the government, we cannot say that the district court erred in denying summary judgment. Accordingly, we uphold its order denying summary judgment on the second and third claims and remand those claims to the district court for its determination.

*Affirmed in part, reversed in part, and remanded.*