**BP EXPLORATION & OIL, INC., Plaintiff,**

v.

**U.S. DEPARTMENT OF TRANS-PORTATION and U.S. Coast Guard, Defendants.**

**No. Civ.A. 97–1206(PLF).**

United States District Court, District of Columbia.

March 26, 1999.

Scott Thomas Kragie, Squire Sanders & Dempsey, Washington, DC, for plaintiff.

Scott Sutherland Harris, U.S. Attorney's Office, Washington, DC, for defendants.

## OPINION

PAUL L. FRIEDMAN, District Judge.

This matter is before the Court on the parties' cross-motions for summary judgment. BP Exploration & Oil, Inc. ("BP") challenges the Coast Guard's assessment of a $5,000 penalty against it under the Clean Water Act for the discharge of a harmful quantity of oil into Curtis Bay in Baltimore, Maryland. Because the Court concludes that the Coast Guard's determination that BP is liable for the discharge is supported by substantial evidence in the

administrative record and was not an abuse of discretion, it upholds the Coast Guard's decision.

## I. BACKGROUND

BP operates an oil terminal facility on the banks of Curtis Bay in Baltimore, Maryland. BP's terminal includes an Oil Water Separator ("OWS"), a storm-sewer line, storage tanks, and a truck loading rack. The storm-sewer line carries storm water and entrained oil from nearby storage tanks and the truck loading rack to the OWS. The OWS, in turn, treats the water in three stages or compartments to ensure removal of oil and sediment before the water is discharged into Curtis Bay. BP possesses a valid permit under the National Pollution Discharge Elimination System ("NPDES") to discharge the treated storm water into the bay.

During the night of July 27, 1994, the Baltimore area received heavy rain, which flooded BP's storage tank areas. Early the next morning, BP began draining four storage tank areas through its OWS. At the same time, a BP customer spilled approximately 10 gallons of oil on the truck loading rack, which also empties into the OWS. While the storage tanks were draining, the storm water flowed through the OWS at a rate of approximately 1,865 gallons per minute ("gpm"). It is undisputed that the OWS functions most efficiently at a flow rate of 300 gpm or less and that, at that rate, oil will not collect in the third compartment of the OWS and will not discharge into the Bay. Plaintiff's Motion for Summary Judgment at 5; Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment at 22–23. As the flow rate increases above 300 gpm, however, the water has less retention time in the OWS.

On July 28, 1994, BP was draining its storage tanks. About 1:40 p.m., the Coast Guard received a call from Star Enterprises, which is located just to the east of BP's facility, reporting that oil and debris had accumulated on the west-northwest side of

Star's boom.[1] Coast Guard investigators arrived at Star. Enterprises around 3:00 p.m. and found that a patch of oil had in fact accumulated against the western side of Star's boom. The investigators confirmed that the oil had not come from Star and proceeded to BP's facility, where for about thirty minutes BP employees had been using sorbent pads manipulated by long poles to remove oil from within OWS stage three. Coast Guard investigators inspected OWS discharge pipes and determined that intermittent patches of a light sheen were being discharged from stage three into Curtis Bay. The Coast Guard concluded that the sheen was oil that had been discharged. U.S. Coast Guard Investigator's Report at 1, Administrative Record ("A.R.") at 300.

On February 21, 1995, the Coast Guard notified BP that the agency was initiating civil proceedings against BP for discharging oil into Curtis Bay in violation of the Clean Water Act. On September 25, 1995, the Coast Guard held a hearing, at which BP argued that the discharge resulted from "operator error" when BP employees disturbed already-separated oil in the OWS during their attempt to clean it up with sorbent pads.[2] Although the hearing officer found that BP's clean-up attempts did contribute to the problem, he also concluded that the increased flow rate caused the oil spill and therefore assessed a Class I administrative penalty of $5,000. Letter from R.H. Smoyer, Coast Guard Hearing Officer to Jeffrey Conrad, BP Oil Company ("Smoyer Letter") at 1, A.R. at 23. BP appealed the hearing officer's decision to the Coast Guard Commandant, who found through his designee that "waste oil in a quantity that may be harmful was discharged from an oily [sic] water separator (OWS), causing a sheen on the water," in violation of the Clean Water Act, and that the statutory exemption on which BP relied did not apply because "the record [did] not indicate that BP's OWS at the facility was. designed to, nor was it capable of, processing the spilled oil and rainwater." Letter from Michael L. Emge, Commander, U.S. Coast Guard, Office of Maritime and International Law, to Jeffrey C. Conrad, Esq., BP America, Inc. ("Emge Letter") at 1, 2, A.R. at 4, 5. BP submitted a $5,000 check in payment of the penalty and filed this action seeking a refund. A.R. at 1, 2.

## II. DISCUSSION

### A. Jurisdiction and Mootness

■ The Coast Guard asserts that the Court lacks jurisdiction because the Clean Water Act has no refund provision and BP has failed to identify any waiver of sovereign immunity that would permit its refund suit. The Administrative Procedure Act, however, provides a mechanism for review of a final agency action. Both agency actions made reviewable by statute and final agency actions for which there is no other adequate remedy are subject to

---

1. A "boom" is a temporary floating barrier used to contain oil spills. See Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment at 6 n. 3.

2. The Clean Water Act prohibits the "discharge" of oil in harmful quantities into the navigable waters of the United States. 33 U.S.C. § 1321(b)(3). "Discharge" is defined to include "spilling, leaking, pumping, pouring, emitting, emptying, or dumping . . . ." 33 U.S.C. § 1321(a)(2). A particular discharge may be exempt from the Act, however, if it falls within one of three exemptions. The exemption relevant to this case, called "Exemption C," provides that "continuous or anticipated intermittent discharges from a point source, identified in a [NPDES permit or permit application], which are caused by events occurring within the scope of relevant operating treatment systems" are not discharges subject to liability under Section 1321. 33 U.S.C. § 1321(a)(2)(C). EPA's regulations provide that a discharge is permitted under Exemption C if it is caused by "a control problem, *an operator error*, a system failure or malfunction, an equipment or system startup or shutdown, an equipment wash, or a production schedule change, provided that such upset or failure is not caused by an on-site spill of a hazardous substance." 40 C.F.R. § 117.12(d)(2)(iii) (emphasis added).

judicial review. *See* 5 U.S.C. § 704. While the APA may not allow an action at law for damages against the United States without a specific waiver of sovereign immunity, it does authorize "an equitable action for specific relief," which may in some cases. include "the recovery of specific property or *monies* ...." *Bowen v. Massachusetts,* 487 U.S. 879, 893, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988) (citing *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 688, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949)) (emphasis in original); *see Maryland Dep't of Human Resources v. Dep't of Health and Human Services,* 763 F.2d 1441, 1446 (D.C.Cir.1985) (contrasting the term "money damages" in 5 U.S.C. § 702, a term "normally refer[ring] to a sum of money used as compensatory relief," with "equitable relief" which may occasionally include "a money award").

■ In this case, the Commandant stated that his decision to impose a Class I penalty in the amount of $5,000 "constitutes final agency action," *see* Emge Letter at 1, 2, A.R. at 4, 5, and BP subsequently filed a notice of appeal in· this Court as directed by the statute. *See* 33 U.S.C. § 1321(b)(6)(G)(i). BP therefore is entitled to a review of the Coast Guard's final determination under the APA. In addition, the relevant statute, the Clean Water Act, expressly permits "any person against whom a civil penalty is assessed" to obtain review of such assessment in the United States District Court for the District of Columbia or in any district in which the violation allegedly occurred. *See* 33 U.S.C. § 1321(b)(6)(G). BP properly followed the requirements of the statute in order to obtain review of the Coast Guard's administrative decision, and this Court therefore has jurisdiction.

■ The Coast Guard also suggests that BP's action is moot because BP already has paid its $5,000 penalty. This is a specious argument. BP was under a statutory and regulatory duty to pay the fine immediately, *see* 33 U.S.C. § 1321(b)(6)(H); 33 C.F.R. § 1.07–85(b),

but that does not preclude it from taking steps to seek judicial review and a refund. Indeed, as already noted, the Clean Water Act expressly provides for judicial review of the assessment of a Class I penalty. *See* 33 U.S.C. § 1321(b)(6)(G). Whether BP is entitled to a refund is a very real issue that directly affects BP's rights, as is the issue of the binding nature of the Marine Safety Manual. The case therefore is not moot. *See, e.g., Northwest Pipeline Corp. v. FERC,* 863 F.2d 73, 76 (D.C.Cir.1988) (A case is moot if it "decid[es] questions that cannot affect the rights of litigants in the case before [the Court]") (quoting *Better Gov't Ass'n v. Dep't of State,* 780 F.2d 86, 90–91 (D.C.Cir. 1986)).

### B. Challenges to the Coast Guard's Decision

#### 1. Marine Safety Manual

■ BP first argues that the Coast Guard's reliance on the Marine Safety Manual both in its administrative decision and in this Court are impermissible because the Manual is an invalid rule or regulation that was not promulgated in accordance.·with the notice and comment requirements of ·the Administrative Procedure Act. While Section 553 of the APA expressly requires agencies to afford notice of a proposed rule-making and an opportunity for public comment prior to promulgating a substantive rule, 5 U.S.C. § 553(b), (c), the issuance of interpretive rules and. policy statements and guidance is not so constrained. *See* 5 U.S.C. § 553(b)(3)(A). Although the distinction between a substantive rule and. an interpretive one is not always clear, an interpretive rule is usually non-binding, instructional and explanatory, whereas a substantive rule grants rights, imposes obligations or effects a change in existing law. *See American Hosp. Ass'n v. Bowen,* 834 F.2d 1037, 1045 (D.C.Cir.1987) (citations omitted); *Syncor Int'l Corp. v. Shalala,* 127 F.3d 90, 94–95 (D.C.Cir.1997).

"An agency pronouncement is not deemed a binding regulation merely because it may have 'some substantive impact,' as long as it 'leave[s] the administrator free to exercise his informed discretion.'" *Brock v. Cathedral Bluffs Shale Oil Co.,* 796 F.2d 533, 537 (D.C.Cir.1986) (quoting *Guardian Fed. Sav. & Loan Ass'n v. Federal Sav. & Loan Ins. Corp.,* 589 F.2d 658, 666, 668 (D.C.Cir.1978)).

An agency must act consistently with its own pronouncements, procedures and policies only when "the agency intended to establish a 'substantive' rule, one which is not merely interpretative but which creates or modifies rights that can be enforced against the agency." *National Latino Media Coalition v. FCC,* 816 F.2d 785, 788 n. 2 (D.C.Cir.1987). "[E]nunciating a policy is simply not the same as creating a binding substantive right.... The touchstone for enforceability is agency intent." *Jackson v. Culinary School of Washington,* 27 F.3d 573, 584 & n. 21 (D.C.Cir.1994), *vacated on other grounds,* 515 U.S. 1139, 115 S.Ct. 2573, 132 L.Ed.2d 824 (1995). Whether a policy statement is enforceable turns on "the agency's intent to be bound." *Vietnam Veterans of America v. Secretary of the Navy,* 843 F.2d 528, 538 (D.C.Cir.1988); *see Building Industry Ass'n v. Babbitt,* 979 F.Supp. 893, 904–05 (D.D.C.1997) (quoting *Jackson v. Culinary School of Washington,* 27 F.3d at 584). In the absence of an intent to be bound to a particular legal position, "the agency remains free in any particular case to diverge from whatever outcome the policy statement or interpretative rule might suggest." *Vietnam Veterans of America v. Secretary of the Navy,* 843 F.2d at 537; *see Syncor Int'l Corp. v. Shalala,* 127 F.3d at 94.

■ There is no indication that the Marine Safety Manual is binding, or was intended to be binding, upon the Coast Guard. The Manual provides in the first chapter that while it is "the primary policy and procedure statement" for the marine safety programs of the Coast Guard, the Manual should only be used as "a guide for consistent and uniform administration of marine safety activities, without undue hampering of independent action and judgment by marine safety personnel." U.S. COAST GUARD MARINE SAFETY MANUAL ("Manual"), Defendant's Reply to Plaintiff's Opposition, Exh. 1 at 2. It further provides that in any case of apparent conflict between provisions of the Manual and any statute or regulation, "the legal requirements shall be observed." *Id.* Neither the Coast Guard hearing officer nor the Commandant therefore was free to disregard the law or regulations and neither cited to the Manual as authority for his decision or suggested that he felt bound by it in deciding this case. Indeed, the hearing officer expressly mentioned the Manual only once and then stated that he was *not* bound by its "guidance" in determining the appropriate penalty. *See* Smoyer Letter at 2, A.R. at 24. Because the Coast Guard has not demonstrated any intent to be bound by the Manual and quite clearly is not bound, the Court finds that the Coast guard was not required to subject the Manual to the notice and comment procedures of the APA before issuing it.[3]

## 2. Decision of the Agency

■ BP argues that the Coast Guard's decision to penalize BP was not based on substantial evidence in the record and that

**3.** Given the purpose and nature of the Manual in the context of the hearing officer's and the Commandant's responsibilities in a case like this, the Manual serves a function similar to that of the United States Attorneys' Manual. *See* UNITED STATES ATTORNEYS' MANUAL 9–2 (1997). Courts have repeatedly held that the United States Attorneys' Manual's announced policy against successive prosecutions in both state and federal courts is not binding and unenforceable in court against federal prosecutors. *See, e.g., United States v. Lester,* 992 F.2d 174, 176 (8th Cir.1993); *United States v. Gourley,* 835 F.2d 249 (10th Cir.1987); *United States v. Ng,* 699 F.2d 63 (2nd Cir.1983); *Nichols v. Reno,* 931 F.Supp. 748, 751–52 (D.Colo.1996), *aff'd,* 124 F.3d 1376 (10th Cir. 1997).

it was an abuse of discretion because the hearing officer failed to consider certain evidence related to the flow rate. BP has properly framed the issue under both the Clean Water Act and the APA. Congress has provided that a court cannot overturn a decision imposing a civil penalty under the Clean Water Act "unless there is not substantial evidence in the record, taken as a whole, to support the finding of a violation or unless the Administrator's or the Secretary's assessment of the penalty constitutes an abuse of discretion." 33 U.S.C. § 1321(b)(6)(G). Both of these standards—"substantial evidence" and "abuse of discretion"—mirror those found in the Administrative Procedure Act, 5 U.S.C. § 706(A)(2), and should be interpreted and applied in the same way that they are interpreted and applied under the APA. *Cf. General Motors Corp. v. EPA,* 168 F.3d 1377, 1380 (D.C.Cir.1999) ("We review the EPA's finding of violations of a permit issued under the Clean Water Act for lack of 'substantial evidence in the record, taken as a whole,' and the assessment of an administrative penalty for 'abuse of discretion' . . . as we would under the Administrative Procedure Act"); *Buxton v. U.S. Env'tl. Protection Agency,* 961 F.Supp. 6, 9 (D.D.C.1997) (same).

"Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion." *Secretary of Labor v. Federal Mine Safety and Health Review Comm'n,* 111 F.3d 913, 918 (D.C.Cir.1997) (quoting *Chaney Creek Coal Corp. v. Federal Mine Safety and Health Review Comm'n,* 866 F.2d 1424, 1431 (D.C.Cir.1989)). "An agency's conclusion 'may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view.'" *Id.* (quoting *Western Air Lines, Inc. v. Civil Aeronautics Board,* 495 F.2d 145, 152 (D.C.Cir.1974)). While a reviewing court must "carefully scrutinize the entire record," it may not reweigh the evidence and replace the agency's judgment "regarding the weight and validity of the evi-

dence with its own." *Dunn v. Shalala,* 866 F.Supp. 595, 598 (D.D.C.1994) (quoting *Davis v. Heckler,* 566 F.Supp. 1193, 1195 (D.D.C.1983)); *see Arkansas v. Oklahoma,* 503 U.S. 91, 113, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992) ("The court should not supplant the agency's findings merely by identifying alternative findings that could be supported by substantial evidence"). The Court therefore may not overturn the Coast Guard's decision in this matter unless no reasonable interpretation of the evidence could justify it.

The "abuse of discretion" standard is highly deferential to the agency:

[T]he Court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The Court is not empowered to substitute its judgment for that of the agency.

*Jack Wood Construction Co., v. United States Dep't of Transportation,* 12 F.Supp.2d 25, 28 (D.D.C.1998) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)); *see Motor Vehicles Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). The Court's "task is to determine 'whether the agency's decisionmaking was reasoned' . . . *i.e.,* whether it considered relevant factors and explained the facts and policy concerns on which it relied, and whether those facts have some basis in the record." *National Treasury Employees Union v. Horner,* 854 F.2d 490, 498 (D.C.Cir.1988) (quoting *American Horse Protection Ass'n, Inc. v. Lyng,* 812 F.2d 1, 5 (D.C.Cir. 1987)).

■ The primary issue before the Coast Guard in this case was whether the discharge was allowable under the Clean Water Act because it was "caused by events occurring within the scope of relevant op-

erating or treatment systems." 33 U.S.C. § 1321(a)(2). "Operator error" is one such excusable cause of an unpermitted discharge. *See* 40 C.F.R. § 117.12(d)(2)(iii). According to BP, its OWS was capable of processing the water at flow rates of 1,865 gpm, the rate of flow on the day of the discharge, so there must have been a reason other than flow rate why the system failed and oil was discharged. BP cites the opinion of Mr. C.T. Cinko, a Coast Guard investigator, to suggest that oil will not discharge until the flow rate reaches 15,932 gpm and argues that the Coast Guard abused its discretion by not even considering this evidence. Plaintiff's Motion for Summary Judgment at 25–26. Primarily on the basis of this allegedly excluded evidence, BP maintains that the cause of the discharge must have been operator error in manipulating the poles and sorbent pads used to remove oil from stage three of the OWS, not from the design of the OWS or its ability to process the increased flow rate on the day in question.[4]

Contrary to BP's argument, the Coast Guard considered the relevant evidence and simply rejected BP's position. Based on the statements of BP's own oil manager that the discharge occurred during the draining of the dikes, the Commandant found that the increased flow rate—at least six times the agreed upon normal flow rate of 300 gpm—caused the oil discharge into Curtis Bay. Emge Letter at 2, A.R. at 5. Even BP's in-house expert would not state with absolute certainty that the increased flow rate could not have

caused the discharge. *See* BP Expert's Report at 3, A.R. at 100 ("when flow rate ... is greater than 300 gallons/minute oil is *not likely* [to be] discharged to Curtis Bay") (emphasis added).

As for Mr. Cinko, the Coast Guard official on whom BP relies, he opined that the 1,865 flow rate did not include the initial surge rate and that this initial surge was likely a major cause of the discharge. MSO Baltimore Investigator's Statement at 2, A.R. at 51. In addition, as the Coast Guard points out, Mr. Cinko was not addressing the rate of oil already entrained in the storm water but rather was discussing the possibility that already-separated oil that had settled to the bottom of the OWS would be taken back up and discharged. Defendants' Reply to Plaintiff's Opposition at 15; *see* Emge Letter at 2, A.R. at 5. Specifically, Mr. Cinko concluded that "the sediment in the [third] compartment would have been flushed out with or without the disturbing of the pea gravel [on the bottom of the third compartment] due to the fact of the buildup of the sediment up to the discharge pipes...." MSO Baltimore Investigator's Statement at 2, A.R. at 51.

In addition, the Coast Guard found that BP's alternative interpretation of the events of July 28, 1994 was inconsistent with the temporal evidence. Star Enterprises reported the patch of oil against its loading pier at 1:40 p.m. *See* Marine Violation Case File, A.R. at 293. BP did not begin its attempt to clean the OWS until 2:30 p.m. *See* BP's Post Hearing Brief at 8, A.R. at 62.[5] The Coast Guard therefore

---

4. Through an expert, BP states that oil would not flow into the third compartment of the OWS unless the flow rate exceeded 300 gpm and would not "remain entrained in the water flowing through the OWS" to the Bay if the flow rate were less than 300 gpm because the oil would be captured in the second compartment and "not be carried through to the third compartment." At the lower flow rates, the oil therefore would never be discharged to the Bay. *See* BP Expert's Report, A.R. at 98–101 (analysis of sediment and flow rates prepared by BP). It concedes, however, that when flow rates exceed 300 gpm, oil may flow into

the third compartment but maintains that even when the flow rate exceeds 300 gpm "oil is not likely discharged to Curtis Bay...." *Id.* at 3, A.R. at 100. "The flow rate would have to greatly exceed" 300 gpm before retention time in the third compartment would be insufficient to separate and retain entrained oil entering the third compartment. *Id.*

5. BP's attempt to distinguish the "patch" of oil on the west-northwest side of Star's pier from the "sheen" of oil on the west side of Star's boom is an unpersuasive parsing of the words of the Coast Guard reports. Even as-

concluded that the clean-up efforts did not cause the discharge of oil because the oil was observed *before* any clean-up began. Defendants' Reply to Plaintiff's Opposition at 17–18. Because the cumulative evidence in the record and considered by the Coast Guard more than rises to the level of "substantial evidence," and because there is no indication that the Coast Guard abused its discretion in evaluating it, the Court will not disturb the Coast Guard's finding of liability.

■ Nor was it an abuse of discretion for the Coast Guard to impose a $5,000 penalty in this case. The $5,000 penalty was half the amount allowable by statute for a Class I violation. *See* 33 U.S.C. § 1321(b)(6). The Coast Guard hearing officer determined that $5,000 was justified in light of a similar incident involving the BP facility at Curtis Bay that occurred less than five months before the July 28, 1994 incident, a permissible consideration under the statute. *See* 33 U.S.C. § 1321(b)(8) (Coast Guard may consider "any history of prior violations" in determining a penalty assessment). There was also evidence that BP's boom was placed on the shoreline and not in the water to contain the discharge, thereby heightening BP's culpability. *See* U.S. Coast Guard Investigator's Report at 1, A.R. at 300. Because the amount assessed is below the statutory maximum permitted and appears to be fair in light of the facts in the record, the penalty imposed by the Coast Guard was within its discretion.

SO ORDERED.

suming the "patch" of oil and the "sheen" of oil were two different things, substantial evidence in the record supports the Coast Guard's finding that BP was the source of both on the west side of Star's facilities.