Michael JACKSON, et al., Appellants,

v.

CULINARY SCHOOL OF
WASHINGTON, LTD.,
et al., Appellees.

No. 93–5083.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 13, 1994.

Decided June 24, 1994.

As Amended June 24, 1994.

Michael E. Tankersley, argued the cause, for appellants. With him on the briefs were Brian Wolfman, Alan B. Morrison and Clare L. McCulla. Paul A. Fiscella entered an appearance.

Fred E. Haynes, Asst. U.S. Atty., argued the cause, for appellee Riley, Secretary of Educ. With him on the brief were Eric H. Holder, Jr., U.S. Atty., and John D. Bates and R. Craig Lawrence, Asst. U.S. Attys.

W. Scott Davis, argued the cause, for appellees Nebraska Student Loan Program, Inc., et al. With him on the brief was Douglas K. Spaulding.

On the brief, for appellee Great Lakes Higher Educ. Corp. was Ann U. Smith. Michael R. Hatcher entered an appearance.

On the brief, for appellee Crestar Bank were Mark B. Bierbower and Virginia W. Powell.

On the brief, for appellee Virginia State Educ. Asst. Authority was Richard C. Kast, Asst. Atty. Gen. for the State of Virginia.

Leslie H. Wiesenfelder entered an appearance, for appellee Ohio Student Loan Com'n.

Before: WALD, SILBERMAN and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

This complicated case asks us to chart the available defenses to the enforcement of student loans made under the Higher Education Act of 1965, 20 U.S.C. §§ 1070 *et seq.* ("HEA" or "Act"). Appellants, fifty-nine former students of the now-defunct Culinary School of Washington ("Culinary School"), seek declaratory and injunctive relief against the enforcement of their student loans by various lenders, public and private guaranty agencies, and the Secretary of Education ("Secretary"). All of the parties to this case agree that appellants have valid claims sounding in fraud and breach of contract against the Culinary School, which is now apparently judgment-proof. This case asks us to determine to what extent these claims may be asserted as defenses against collection by third-party lenders and their assignees.

Generally speaking, appellants' contentions may be divided into state[1] and federal claims. In the former category lie appellants' claims that several District of Columbia Code provisions and one common law contractual rule permit the assertion, in certain circumstances, of defenses they have against the school in enforcement actions by holders of the loans. In the latter category

---

1. For the sake of clarity, this opinion treats the term "state" as encompassing the District of Columbia.

rests appellants' argument that the close lender-school relationship at issue here brings this case within the ambit of the Secretary's origination policy, under which the Secretary allegedly promises to forbear from enforcing loans when the lender cedes certain traditional lender functions to schools.[2]

We conclude that the state-based claims, several of which present preemption questions of substantial import, are unsuitable for resolution by declaratory judgment. The borrowers in this suit hail from all over the country. The primary lenders and guaranty agencies are based in Virginia, Ohio, Nebraska, Wisconsin, and Texas. The only consistent nexus to the District of Columbia in this case is the location of the Culinary School. Under these circumstances, we find it inadvisable to make pronouncements on the scope or application of D.C. law in this declaratory judgment posture.[3] Without prejudice to the possible assertion of such defenses in a future coercive action, we exercise our discretion to deny the declaratory judgment remedy, and hence the injunction that might flow from such remedy, at this time.

The origination claim, which is based on federal law, does not give rise to such speculation and is therefore fit for immediate resolution. We affirm the district court's ultimate disposition of this claim, but do so on different grounds. The Secretary of Education did not argue below that appellants had no enforceable rights in the origination policy. But neither did he concede the point. The district court, in assessing the merits of the claim, actually decided the issue, finding that the Secretary signified an intention to be bound by his origination policy. In light of the district court's disposition of the issue, we may decide it without intractable waiver problems. After careful review, we conclude

that the Secretary of Education's "policy," which was evident in several letters from Department of Education ("Department") personnel but was not committed to rule, is not binding against the Department, and is therefore unenforceable by appellants. We find it unnecessary to evaluate the district court's other conclusions with respect to summary judgment.

## I. BACKGROUND

### A.

The Guaranteed Student Loan Program ("GSLP") was established by the Higher Education Act of 1965, 20 U.S.C. §§ 1070 *et seq.*, in order to "assist in making available the benefits of postsecondary education to eligible students . . . in institutions of higher education."[4] *See* 20 U.S.C. § 1070(a). Under the relevant portion of the program, the federal government provides interest subsidies and special allowances to eligible lenders, *see* 20 U.S.C. §§ 1078(a)(3), 1087–1, and insures against borrower default, *see* 20 U.S.C. § 1078(c), thus minimizing the traditional elements of risk inherent in making student loans. The mechanics of the GSLP are relatively simple: private lenders advance their own funds to eligible students; state and private guaranty agencies guarantee these loans against default; and the Department of Education acts as ultimate reinsurer of 80% to 100% of the guaranty agency's losses should its diligent efforts to procure repayment from the borrower prove unsuccessful, *see* 20 U.S.C. § 1078(c)(1). The Secretary may demand an assignment of any defaulted loan on which it has made payment to a guaranty agency, *see* 20 U.S.C. § 1078(c)(8). However, collection responsi-

---

**2.** Appellants initially attempted to assert their origination claim against the guaranty agencies as well as the Secretary. The district court dismissed the claim against the guaranty agencies, concluding that the Secretary's policy could not bind third parties. Appellants do not appeal this determination.

**3.** We do conclude that the Higher Education Act does not preempt the field of state consumer protection regulation. However, this conclusion does not assist appellants, but merely paves the

way for the thornier conflicts preemption analysis that we decline to undertake at this time.

**4.** The term "Guaranteed Student Loan Program" is actually an umbrella term for four different loan programs established under the HEA: the Stafford Loan Program, 20 U.S.C. § 1078, the Supplemental Loans for Students Program, 20 U.S.C. § 1078–1, the PLUS Loan Program, 20 U.S.C. § 1078–2, and the Consolidation Loan Program, 20 U.S.C. § 1078–3.

bilities have in practice fallen largely on the guaranty agencies.

In order to participate in the GSLP, schools must meet the statutory definition of "eligible institutions," see 20 U.S.C. § 1085(a), enter into a program participation agreement with the Secretary of Education, see 20 U.S.C. § 1094(a), and be accepted for participation in the program of one or more guaranty agencies. During the time period at issue here, loan application forms were prepared by guaranty agencies and approved by the Secretary.[5] The forms contained separate sections to be completed by the borrower, the school, and the lender. Under the Act, schools are required to provide the lenders with a "statement" setting forth a student's estimated costs of attendance, forecasting a student's financial assistance needs, and setting up a schedule for disbursement of loan proceeds. See 20 U.S.C. § 1078(a)(2).

### B.

The Culinary School recruited students from around the country by representing that it would provide vocational training and certification in the culinary arts that would qualify students as gourmet chefs. Among other things, the school promised instruction by master chefs in professionally equipped kitchens at various embassies, full transportation to and from classes, housing that would involve a single roommate, and job placement services. Relying on these representations, the fifty-nine appellants in this case signed up for the program and were students at the school at various times between May 1, 1985 and early 1990.

Accredited by the National Association of Trade and Technical Schools ("NATTS") in 1982 and the Accrediting Council for Continuing Education and Training ("ACCET") in 1985,[6] the Culinary School participated in federal student assistance programs between 1982 and June 1990. During that time, students at the school received $18.8 million in GSLP loans, made by approximately twenty-eight banks and guaranteed by six different guaranty agencies. See Memorandum in Support of the Secretary of Education's Motion to Dismiss, Aug. 2, 1991, at 3–4. The Culinary School handled several aspects of the federal financial aid program for its students, providing them with pre-printed loan applications, completing statements on the loan applications requiring estimates of the loan amounts, verifying their identities, and counseling them on loan terms.[7] Most of the appellants signed their financial aid forms at the Culinary School. The school forwarded these forms to the lenders, which were authorized to extend GSLP loans under 20 U.S.C. § 1071. The banks approved and processed the loans at their branches, after receipt of guarantees by the guaranty agencies. Appellants did not have direct contact with the lenders.

Upon matriculating at the school, appellants' aspirations of fast-track careers in the culinary arts quickly soured. The record is rife with allegations that the Culinary School failed to perform in accordance with its representations. Students who expected free transportation either found their transportation costs deducted from their loan monies or were provided no transportation at all. Housing arrangements required four people to live in a one-bedroom apartment. Several students were actually or constructively evicted from their school-provided housing after the school failed to pay rent and utili-

---

5. In 1992, Congress ordered the Secretary to develop a common loan application form and promissory note to be used by all participants in the GSLP. See 20 U.S.C. § 1082(m)(1) (Supp. IV 1993). The new loan form incorporates the Federal Trade Commission (FTC) clause preserving consumer claims and defenses against subsequent holders of consumer credit contracts when the school has a referral or affiliation relationship with the lender. See generally 16 C.F.R. § 433.2(a). In this respect, the new form appears to resolve many questions presented in this case prospectively.

6. The Culinary School ultimately lost its NATTS accreditation. Throughout the period, however, the school remained accredited by ACCET.

7. The parties dispute the extent of the school's role in selecting the lenders. See, e.g., Jackson v. Culinary School of Washington, 811 F.Supp. 714, 721 (D.D.C.1993) (district court assuming but not deciding that school had exerted pressure on students to pick particular lenders, and finding this fact immaterial to appellants' origination claim). We need not reach this issue given our disposition of this case.

ties. Classes were conducted under unsanitary conditions. Job placement services often consisted of little more than a school employee scanning classified advertisements in the newspaper. In January 1990, after repeated complaints concerning its misconduct and an inquiry by the D.C. Education Licensure Commission, the Culinary School filed for bankruptcy. The school withdrew its application for a renewed operating license in the District of Columbia in June 1990, promptly ceasing all operations.

In 1991, appellants filed this action against the Culinary School, the lenders on their loans, the guaranty agencies, and the Secretary of Education seeking, *inter alia*, declaratory and injunctive relief against ongoing collection on their loan obligations. Appellants contended that the school had fraudulently induced them to enroll and to execute GSLP loans and had breached its contractual obligations. Appellants also argued that their claims and defenses against the school could be asserted as defenses to enforcement of their loans. The Culinary School failed to appear, and the district court entered a default judgment finding the school liable for fraud and breach of contract.

In two separate rulings, the district court rejected appellants' arguments that their claims against the Culinary School could be asserted as defenses against the lenders and their assignees. In its March 26, 1992 opinion, the district court held that federal law preempted application of § 28–3809(a)(1) of the District of Columbia Consumer Credit Protection Act ("CCPA"), under which consumers' claims and defenses are available when "the seller participates in the preparation of the loan documents," and D.C.Code § 28–3807, which prohibits the use of negotiable instruments in consumer credit sales and makes holders of notes in violation of this provision subject to buyers' claims and defenses. *See Jackson v. Culinary School of Washington*, 788 F.Supp. 1233, 1246–48, 1255 (D.D.C.1992) ("*Jackson I* ").

Turning to appellants' claims based on the FTC Holder Rule, the district court agreed that GSLP loans were consumer credit contracts subject to the terms of the rule, which requires the inclusion of notice in credit agreements that subsequent holders take the contracts subject to buyers' defenses. *See id.* at 1251. The loan agreements at issue did not include such notice. In its first opinion, the district court found that, although appellants did not have a federal right to enforce the FTC Holder Rule, state law could provide relief for its violation. The district court rejected appellants' initial argument that the requisite notice under the FTC Holder Rule could be implied into the contract under common law. *See id.* at 1251. It then held that appellants' claim that the absence of notice violated D.C.Code § 28–3904(r), which makes it unlawful for any person to "make or enforce unconscionable terms or provisions of sales or leases," withstood appellees' motion to dismiss. *See id.* at 1253. However, the court granted appellees' motion to dismiss a claim based on the D.C. Proprietary Schools Regulation § 1212.1, which prohibits schools from using contract provisions or other devices as a means of denying the benefits of federal or D.C. law. *See id.* at 1255. In its January 6, 1993 opinion, the district court ultimately granted summary judgment for appellees on the § 28–3904(r) claim, concluding that appellants had failed to come forward with evidence demonstrating that, in the absence of the FTC Holder Rule's notice, the loan contracts were unreasonably favorable to appellees. *See Jackson v. Culinary School of Washington*, 811 F.Supp. 714, 723 (D.D.C. 1993) ("*Jackson II* ").

Finally, in its January 6, 1993 opinion, the district court granted summary judgment for the Secretary on appellants' claim that the close relationship between the lenders and the Culinary School on these facts gave rise to an origination relationship. *See id.* at 720–22. Although the district court had previously found that the Secretary's policy of refraining from collection under such circumstances was enforceable by appellants against the Secretary, *see Jackson I*, 788 F.Supp. at 1241, the court concluded in *Jackson II* that appellants had failed to demonstrate a delegation of substantial lender functions to the school sufficient to bring them within the purview of the Secretary's policy. Appellants filed this timely appeal.

## II. Analysis

Appellants make four principal arguments before this court.[8] First, they contend that two different provisions of the CCPA, § 28–3807 and § 28–3809, permit the assertion of claims and defenses against third-party lenders and their assignees on these facts. Second, they argue that the FTC Holder Rule, as a federal requirement, may be implied into their contracts under common law contract principles. Third, they maintain that the absence of contractual notice in accordance with the FTC Holder Rule violates another provision of the CCPA, § 28–3904(r), and § 1212.1 of the D.C. Proprietary Schools Regulations. Fourth, they contend that the Secretary made an enforceable promise not to seek collection upon defaulted loans when the school and lender are in an "origination relationship." Appellants urge that circumstances in this case give rise to just such a relationship. We consider the first three arguments, which turn on D.C. law, together; we address the fourth (federal) claim separately.

### A.

Appellants' D.C.-based arguments give rise to difficult preemption questions as well as the intricate task of interpreting numerous local provisions. Because we can only speculate whether D.C. law will govern any future coercive suit brought by the declaratory judgment defendants, we decline to reach the merits of these claims at this time.[9]

---

8. Appellants advance several other arguments, subordinate to these crucial points, which focus on the principle that to the extent that their claims and defenses may be invoked against primary lenders, they may also be pressed against the guaranty agencies and the Secretary as assignees or *de facto* lenders. Because of our disposition of this case, we find it unnecessary to consider these claims.

9. The rights and obligations of the Secretary of Education are governed by federal law. *See United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 727, 99 S.Ct. 1448, 1457–58, 59 L.Ed.2d 711 (1979). However, because the content of federal common law in the federal loan context is generally determined by reference to applicable state standards, *see id.* at 729, 99 S.Ct. at 1459, at least absent proof that such standards substantially frustrate federal objectives, our analysis with respect to the Secretary in this case

### 1. *Declaratory Judgment Standards*

We begin by analyzing the declaratory judgment remedy. As has long been recognized, the Declaratory Judgment Act, 28 U.S.C. § 2201 (1988), "is an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." [10] *Green v. Mansour,* 474 U.S. 64, 72, 106 S.Ct. 423, 428, 88 L.Ed.2d 371 (1985) (quoting *Public Serv. Comm'n v. Wycoff Co.,* 344 U.S. 237, 241, 73 S.Ct. 236, 239, 97 L.Ed. 291 (1952)); *see also Cardinal Chem. Co. v. Morton Int'l, Inc.,* — U.S. —, — n. 17, 113 S.Ct. 1967, 1974 n. 17, 124 L.Ed.2d 1 (1993); *ACLU Found. of Southern California v. Barr,* 952 F.2d 457, 466 (D.C.Cir.1991); *Hanes Corp. v. Millard,* 531 F.2d 585, 591 (D.C.Cir.1976). The decision whether to grant the declaratory judgment remedy is "informed by the teachings and experience concerning the functions and extent of federal judicial power." *Wycoff,* 344 U.S. at 243, 73 S.Ct. at 240. Public policy favors declaratory judgments "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." Edwin Borchard, Declaratory Judgments 299 (2d ed. 1941). When a declaratory judgment will play scant role in settling a dispute, it is often better (if not legally necessary) to refrain from granting the declaratory judgment remedy.

---

is virtually identical to our analysis with respect to the guaranty agencies and lenders. *See also United States v. Yazell,* 382 U.S. 341, 354–56, 86 S.Ct. 500, 507–09, 15 L.Ed.2d 404 (1966). Without knowing with confidence what the applicable state standards are, we can only speculate about the content of federal law in this declaratory judgment posture. This we will not do.

10. The Declaratory Judgment Act provides in relevant part:

In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201 (1988).

■ The district court did not appear to question the wisdom or propriety of awarding declaratory relief in this case. We must initially determine, then, by what standard to review the exercise of discretion by the trial court to grant or deny declaratory relief. This circuit has never squarely decided the issue. In *Hanes Corp. v. Millard*, 531 F.2d 585 (D.C.Cir.1976), we noted that "[a] number of courts and commentators take the view that the customary deference observed with respect to certain district court determinations is not applicable in this context, and that an appellate court can, and should, bring its own judgment to bear." *Id.* at 591. We did not expressly adopt this view in *Hanes Corp.*, although we did describe our review as "quite searching." *Id.; see also President v. Vance*, 627 F.2d 353, 364 n. 76 (D.C.Cir. 1980) (noting that *Hanes Corp.* never actually adopted the *de novo* review standard). In subsequent cases, this court seems to have exercised independent judgment, although it has done so without identifying the particular standard under which it has acted. *See Spivey v. Barry*, 665 F.2d 1222, 1235 (D.C.Cir. 1981); *Winpisinger v. Watson*, 628 F.2d 133, 141 (D.C.Cir.), *cert. denied*, 446 U.S. 929, 100 S.Ct. 1867, 64 L.Ed.2d 282 (1980).

The other circuits are divided over the standard of review governing discretionary declaratory relief. The Second, Fifth, Eighth, and Tenth Circuits overturn a trial court's decision only upon finding a clear abuse of discretion. *See, e.g., Christopher P. by Norma P. v. Marcus*, 915 F.2d 794, 802 (2d Cir.1990), *cert. denied*, 498 U.S. 1123, 111 S.Ct. 1081, 112 L.Ed.2d 1186 (1991); *Mission Ins. Co. v. Puritan Fashions Corp.*, 706 F.2d 599, 601 & n. 2 (5th Cir.1983); *United States Fidelity & Guar. Co. v. Murphy Oil USA, Inc.*, 21 F.3d 259, 263 n. 5 (8th Cir.1994); *Kunkel v. Continental Casualty Co.*, 866 F.2d 1269, 1273 (10th Cir.1989). The Fourth, Sixth, Seventh, Ninth, Eleventh, and Federal Circuits review the district court's determination *de novo. See, e.g., Mitcheson v. Harris*, 955 F.2d 235, 237 (4th Cir.1992); *Grand Trunk Western R.R. Co. v. Consolidated Rail Corp.*, 746 F.2d 323, 325–26 (6th Cir.1984); *Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.*, 819 F.2d 746, 749 (7th Cir.1987); *United States v. Washington*, 759 F.2d 1353,

1356–57 (9th Cir.) *(en banc), cert. denied*, 474 U.S. 994, 106 S.Ct. 407, 88 L.Ed.2d 358 (1985); *Cincinnati Ins. Co. v. Holbrook*, 867 F.2d 1330, 1333 (11th Cir.1989); *Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 936 (Fed.Cir.1993). The First Circuit occupies a self-styled "middle-ground," avowing that it "cede[s] some deference to the trier" but "will not hesitate to act upon our independent judgment if it appears that a mistake has been made." *El Dia, Inc. v. Hernandez Colon*, 963 F.2d 488, 492 (1st Cir.1992). The Third Circuit employs its own form of intermediate scrutiny, reviewing trial court decisions granting declaratory relief under an abuse of discretion standard while reviewing decisions denying such relief more sharply. *See Exxon Corp. v. FTC*, 588 F.2d 895, 900 (3d Cir.1978). Commentators have virtually unanimously lauded the *de novo* standard. *See* EDWIN BORCHARD, DECLARATORY JUDGMENTS 294 (2d ed. 1941); Henry J. Friendly, *Indiscretion About Discretion*, 31 EMORY L.J. 747, 778–79 (1982); 10A CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2759 n. 22 (Supp.1993); 6A J. MOORE, MOORE'S FEDERAL PRACTICE ¶ 57.08[2] (2d ed. 1982).

We adopt the view implicitly embraced by our precedents, currently employed by the Fourth, Sixth, Seventh, Ninth, Eleventh, and Federal Circuits, and approved by the overwhelming majority of commentators, that appellate courts must exercise independent judgment in evaluating the propriety of granting declaratory relief. It is difficult to see why we should be required to expand dramatically upon the law of this circuit when equitable and prudential factors indicate that our efforts are not likely to resolve the controversy. *See Grand Trunk R.R.*, 746 F.2d at 326. "Legal rules of general applicability are announced when their consequences are known and understood in the case before the court, not when the subject parties and the court giving judgment are left to guess at their meaning." *Washington*, 759 F.2d at 1357. Furthermore, like the Seventh Circuit, we believe that "the decision whether to allow a declaratory judgment action to proceed is one which calls for 'discretion hardened by experience into rule.' "

*Tempco Elec. Heater,* 819 F.2d at 749 (quoting BORCHARD, *supra,* at 293). The objective of formulating standards by which to guide the exercise of discretion over the declaratory judgment remedy in the future is best served by vigorous and independent appellate review.

2. *Application*

Pursuant to this standard, we find it expedient to decline appellants' invitation to construe D.C. law and its effect on the federal scheme at this time. In *Hanes Corp. v. Millard,* 531 F.2d 585 (D.C.Cir.1976), this court noted several factors bearing on the propriety of granting declaratory judgment. Acknowledging that general formulations were often difficult, we listed such factors as "whether [declaratory relief] would finally settle the controversy between the parties; whether other remedies are available or other proceedings pending; the convenience of the parties; the equity of the conduct of the declaratory judgment plaintiff; prevention of 'procedural fencing'; the state of the record; the degree of adverseness between the parties; and the public importance of the question to be decided." *Id.* at 591 n. 4 (citing 10 CHARLES A. WRIGHT ET AL., *supra,* § 2759). We also quoted Professor Borchard's oft-cited formulation that "the declaration is an instrument of practical relief and will not be issued where it does not serve a useful purpose." *Id.* at 592 (quoting BORCHARD, *supra,* at 307).

a. *D.C.Code §§ 28–3807, 28–3809*

█ Whether appellants may use D.C. Consumer Credit Protection Act § 28–3807 and § 28–3809 as mechanisms for asserting defenses against lenders, guaranty agencies, and the Secretary is a question that requires in-depth preemption analysis. It is useful here to provide a thumbnail sketch of the law of preemption. The Supreme Court's preemption analysis has followed three tracks.[11] First, Congress may preempt state law explicitly in the text of its statute ("express preemption"). *See English v. General Elec. Co.,* 496 U.S. 72, 78, 110 S.Ct. 2270, 2274–75, 110 L.Ed.2d 65 (1990). Preemption is fundamentally a question of congressional intent, *see Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 299, 108 S.Ct. 1145, 1150, 99 L.Ed.2d 316 (1988), and when Congress has made its intent known through explicit statutory language, the courts' task is a simple one. Second, in the absence of express statutory language, Congress may preempt state regulation of a field that it intended the federal government to occupy exclusively ("field preemption"). *See Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Third, even when Congress has apparently left room for state regulation in the field, state law is preempted to the extent that it actually conflicts with federal law ("conflict preemption"). The Supreme Court has found an actual conflict where "compliance with both federal and state regulations is a physical impossibility for one engaged in interstate commerce," *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), and where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

█ In this case the express and field preemption questions may easily be resolved in appellants' favor. Although Congress addressed the issue of preemption in the HEA, specifically displacing state disclosure laws, 20 U.S.C. § 1099, usury laws, 20 U.S.C. § 1078(d), statutes of limitation, 20 U.S.C. § 1091a, and infancy defenses, 20 U.S.C. § 1091a, it did not expressly preempt state consumer defenses. The field preemption argument is similarly untenable. In *Cipollone v. Liggett Group, Inc.,* —— U.S. ——, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), the Supreme Court stated that "[w]hen Congress

---

**11.** Although the Court has traditionally adverted to a tripartite framework, the use of three distinct categories is somewhat of a misnomer. As Justice Blackmun noted for the majority in *English v. General Elec. Co.,* 496 U.S. 72, 80 n. 5, 110 S.Ct. 2270, 2275 n. 5, 110 L.Ed.2d 65 (1990), "field pre-emption may be understood as a species of conflict pre-emption: A state law that falls within a pre-empted field conflicts with Congress' intent (either express or plainly implied) to exclude state regulation."

has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a reliable indicium of congressional intent with respect to state authority, there is no need to infer congressional intent to preempt state laws from the substantive provisions of the legislation." *Id.* at ——, 112 S.Ct. at 2618 (citations and internal quotation marks omitted). Writing for the majority, Justice Stevens reasoned that this was a variant of the familiar principle *expressio unius est exclusio alterius:* "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *Id.*[12] Because Congress carved out particular contexts in which the HEA has preemptive effect, the conclusion is virtually inescapable that Congress did not intend to give the HEA preemptive effect in every context.[13]

■ Resolution of the express and field preemption questions, however, does not take appellants far enough. The crux of the preemption question in this case is a complicated inquiry into whether the D.C. provisions actually conflict with federal law. Unlike the field preemption question, which turns solely on an interpretation of the federal statute, the conflict preemption analysis that necessarily follows is fraught with uncertainty. So far as the record before us shows, appellants are domiciled in Virginia, Florida, Maryland, Arkansas, Utah, Kentucky, and Georgia, among other places, as well as the District of Columbia. The primary lenders and guaranty agencies in this suit are based in Virginia,

Ohio, Nebraska, Wisconsin, and Texas. The Culinary School is—obviously—in the District of Columbia, and most if not all of the students appear to have signed their loan applications at the school. Lenders approved the loan applications at their respective branches outside of the District of Columbia, however, after receiving guarantees from the guaranty agencies. Taking all of these factors into consideration, we find ourselves unable to say with confidence that D.C. law will apply in *any* future coercive action brought by the declaratory judgment defendants. In light of this uncertainty, we refuse to undertake the highly speculative inquiry into whether D.C. law, which may or may not apply in a future coercive action, actually conflicts with the HEA. To do so would smack uncomfortably of an advisory opinion.

Our conclusion is driven by several factors. First, it is far from clear at this point how many, if any, of the possible coercive suits brought by appellees will be in the District of Columbia courts. Second, whether suits are brought in the District or elsewhere, it is difficult to predict what substantive laws will apply. As to suits brought outside the District, we have no way of knowing what choice of law rules will obtain. *See, e.g.,* EUGENE F. SCOLES & PETER HAY, CONFLICT OF LAWS §§ 18.13–21 (1984) (describing diverse conflict of laws approaches employed by the states in contracts cases, including *lex locus contractus,* governmental interest analysis, and the Second Restatement's flexible center-of-gravity approach).[14] Even as to those appellants domiciled in the District of Colum-

---

**12.** We do not read *Cipollone* to stand for the proposition that the enumeration of preempted areas in a statute forecloses altogether the possibility that state statutes in actual conflict can be preempted. The overriding focus of preemption analysis is on the intent of Congress. *See CSX Transp., Inc. v. Easterwood,* —— U.S. ——, ——, 113 S.Ct. 1732, 1737, 123 L.Ed.2d 387 (1993); *Cipollone,* —— U.S. at ——, 112 S.Ct. at 2617. Where a state statute actually frustrates the purposes of Congress, we do not believe that the specific preemption clauses in a statute alone provide a "reliable indicium of congressional intent with respect to state authority." *Cipollone,* —— U.S. at ——, 112 S.Ct. at 2618.

**13.** This inference is also borne out by persuasive legislative history for subsequent amendments to

the HEA. In rejecting a House proposal to preempt state defenses against lenders, guaranty agencies, and the Secretary, the conferees stated that they were "reluctant to legislate in this area while the issue is pending in the courts," and that they had "instead chosen to leave to the courts the complex determination as to when a student should and should not be able to raise the school's fraud or other misconduct as a defense to the student's loans." H.R.CONF.REPT. No. 630, 102d Cong., 2d Sess. 508 (1992), *reprinted in* 1992 U.S.C.C.A.N. 334, 623.

**14.** To the extent the record points any direction on choice of law, it points against appellants, because several of the loan instruments in this case contained express choice of law provisions identifying other states' laws as providing the

bia (against whom suits will likely be brought in the District), we cannot be sure that D.C. law will apply, given that the loan agreements were approved outside of the District and contained express choice of law clauses specifying non-D.C. law. Third, state laws are by no means uniform in their extension of consumer-protective defenses to this sphere. *See generally* Ralph J. Rohner, *Holder in Due Course in Consumer Transactions: Requiem, Revival, or Reformation?*, 60 CORNELL L.REV. 503, 523 (1975) (observing that "there is little consistency in the specific statutory criteria" by which states have implemented policies of retaining borrower defenses where lenders act in concert with sellers). Thus, for example, several states with interests in this case, like Virginia, Texas, Nebraska, and Ohio, appear to have no state provisions analogous to the D.C.Code provisions at issue.[15] Adding these factors up, we have a classic case in which effort on our part to parse the D.C.Code provisions and to engage in conflict preemption analysis may serve no "useful purpose." *Hanes Corp. v. Millard*, 531 F.2d 585, 592 (D.C.Cir.1976) (citing BORCHARD, *supra*, at 307). As such, we find it inadvisable, to say the least, to grant declaratory relief.[16]

#### b. *The FTC Holder Rule Claims*

■ Appellants' claims that a D.C.Code provision, a D.C. Proprietary Schools Regu-

lation, and a principle of common law[17] permit the preservation of consumer defenses under the FTC Holder Rule must likewise be deferred at this time. Although these claims do not facially present issues of preemption, we are nonetheless unwilling to engage in the delicate task of interpreting various local provisions in the absence of any assurance that such interpretation will be necessary or useful. We simply cannot know at this point whether these three aspects of District of Columbia law will be of any relevance to a future coercive suit.

#### B.

Appellants' sole federal claim does not sound in such speculative terms, because it does not require us to anticipate the applicable state law in a prospective enforcement suit. Essentially, appellants contend that the Secretary has long maintained a policy of refusing to enforce loans where the lender and school have an "origination relationship." The Secretary's GSLP regulations define "origination" as "[a] special relationship between a school and a lender, in which the lender delegates to the school, or to an entity or individual affiliated with the school, substantial functions or responsibilities normally performed by lenders before making loans." 34 C.F.R. § 682.200(b) (1986).[18] Appellants

operative rules of decision. Moreover, as the district court noted in *Nelson v. Nationwide Mortgage Corp.*, 659 F.Supp. 611, 616–17 (D.D.C. 1987), nothing in the CCPA suggests legislative intent to give the statute broad extraterritorial effect.

**15.** It must be noted, however, that the District of Columbia is not alone in permitting consumer defenses in certain situations, although the various state provisions preserving such defenses differ in many respects. *See, e.g.*, IOWA CODE § 537.-3405 (1993); ME.REV.STAT.ANN. tit. 9–A, § 3–404 (West 1993); MD.COM.LAW CODE ANN. § 12–309 (1993); MASS.ANN.LAWS ch. 255, § 12F (Law.Co-op.1994); N.Y. GEN.BUS.LAW § 253 (Consol.1993); OR.REV.STAT. § 83.860 (1993); S.C.CODE ANN. § 37-3-410 (Law.Co-op.1993); W.VA.CODE § 46A-2-103 (1993); WIS.STAT. § 422.408 (1993).

**16.** It is worth mentioning, moreover, that there is little, if any, judicial gloss on these particular D.C.Code provisions to assist us in the conflict preemption inquiry. In that sense, we would have to perform a "step in the shoes of local

courts" function akin to what we do in a diversity action to decide whether the provisions apply to these facts. In situations where the path of local law may not confidently be predicted, this court has frequently certified the questions of local law to the District of Columbia Court of Appeals. *See, e.g.*, *National Union Fire Ins. v. Riggs Nat'l Bank*, 5 F.3d 554, 557 (D.C.Cir.1993); *Delahanty v. Hinckley*, 845 F.2d 1069, 1070 (D.C.Cir.1988).

**17.** Appellants do not maintain that the FTC Holder Rule should be implied into their loan contracts as a matter of *federal* common law. In fact, in their brief appellants criticize the district court for "looking only to federal law." Appellants' Opening Brief at 32.

**18.** The wording of this regulation was reformulated slightly in 1992. *See* 57 Fed.Reg. 60,304 (1992). The differences are not material for our purposes.

point to two letters by the Secretary, a snippet of the Department's 1989 Compromise and Write–Off Procedures for guaranty agencies, and the Secretary's litigation posture in this and other cases as evidence of the Secretary's longstanding policy of abstaining from collection where there is an origination relationship. Appellants must canvass two points to succeed at this argument: (1) they must demonstrate that they have a federally grounded right to enforce the Secretary's alleged promise; and (2) they must show that the Culinary School and the lenders were in an origination relationship within the meaning of the pertinent regulation. We address the first point and find no need to consider the second.

Before evaluating whether the Secretary's policy confers a substantive right on appellants, however, we must examine our authority to consider this issue on appeal. The Secretary did not argue before the district court that appellants lacked an enforceable right. In fact, in his motion to dismiss, the Secretary acknowledged that the Department of Education "has recognized for many years that where there is a 'special relationship' or 'origination relationship' between the school and the lender, then the lender will be subject to the claims against the school as defenses on the loans made by the lender." Memorandum in Support of the Secretary of Education's Motion to Dismiss, Aug. 2, 1991, at 14. In his brief before this court, however, the Secretary argued that the origination rules did not clothe appellants with a cause of action. See Secretary's Opening Brief at 37. We sought supplementary briefing on the issue of enforceability. Citing the relevant case law, the Secretary's Supplemental Brief urges, not surprisingly, that the few statements the Department has made do not constitute binding rules. Appellants, for their part, maintain that the Secretary has either waived the issue of enforceability or conceded it altogether. See Appellants' Supplemental Brief, at 2.

As an initial matter, we do not believe that the Secretary has made any concessions with respect to this important issue. In his motion to dismiss, the Secretary acknowledged the existence of a longstanding policy of restraint when lenders and schools are in an origination relationship.[19] But merely admitting the existence of a policy or its pedigree is not tantamount to conceding its enforceability by third parties. In *Petite v. United States*, 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960), for example, the Solicitor General asked the Supreme Court to remand a case so that the lower court could dismiss an indictment brought in violation of the government's long-standing policy that several offenses arising out of a single transaction should not be made the basis of multiple prosecutions. Although the government's commitment to this prosecution policy, since termed the "*Petite* Policy," could not have been more clear, courts have universally held since that defendants have no right to enforce it. See, e.g., *United States v. Patterson*, 809 F.2d 244, 248 (5th Cir.1987); *United States v. Simpkins*, 953 F.2d 443, 445 (8th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 1988, 118 L.Ed.2d 585 (1992). This insight is not limited to situations in which notions of prosecutorial discretion obtain; enunciating a policy is simply not the same as creating a binding substantive right. We do not read the Secretary's admission that the origination policy exists as a concession of the critical issue of enforceability.

We also do not feel constrained by notions of waiver in this case. To be sure, the Secretary indisputably failed to broach the issue before the district court. However, Supreme Court precedent and our own cases have recognized that we may review an issue if pressed *or* passed on by the court below. See, e.g., *United States v. Williams*, —— U.S. ——, ——, —— & n. 4, 112 S.Ct. 1735, 1739, 1740 & n. 4, 118 L.Ed.2d 352 (1992); *National Fed'n of Fed. Employees v. Greenberg*, 983 F.2d 286, 289 (D.C.Cir.1993).[20] Citing *Tip-*

19. To be accurate, the Secretary admitted that where there was an origination relationship, borrowers could assert defenses against *lenders*. If lenders could not enforce loans because of such viable defenses, neither could their ultimate assignees, guaranty agencies and the Secretary.

20. In addition, "a court may consider an issue 'antecedent to ... and ultimately dispositive of' the dispute before it, even an issue the parties fail to identify and brief." *United States Nat'l Bank v. Independent Ins. Agents*, —— U.S. ——, ——,

*ton v. Secretary of Education,* 768 F.Supp. 540, 570 (S.D.W.Va.1991), the district court concluded that "the Secretary has unequivocally expressed an intention to be bound" by his promise "to abstain from collection of those defaulted student loans arising from an origination relationship." *Jackson I,* 788 F.Supp. at 1241. As such, the court clearly passed upon the issue, and the waiver argument loses both logical and legal force.

■■■ Turning, then, to the merits, we find ourselves unable to agree with the district court's conclusion that the origination "promise" is enforceable by third parties. The touchstone for enforceability is agency intent. In *National Latino Media Coalition v. FCC,* 816 F.2d 785 (D.C.Cir.1987), we wrote that "the 'binding' quality of a particular rule or statement will depend on whether the agency intended to establish a 'substantive' rule, one which is not merely interpretative but which creates or modifies rights that can be enforced against the agency." *Id.* at 788 n. 2. We clarified this standard in *Vietnam Veterans v. Secretary of the Navy,* 843 F.2d 528 (D.C.Cir.1988), reasoning that "statements whose language, context and application suggest an intent to bind agency discretion and private party conduct—the sort of statements requiring compliance with [APA] § 553—will have that effect if valid; interpretative rules or policy statements will not, *regardless* of their validity." *Id.* at 537 (emphasis in original).[21]

The Secretary's alleged policy of restraint is expressed in an amalgam of letters, a sentence in the 1989 Compromise and Write-Off Procedures, and snippets of legal briefs. *See, e.g.,* Letter from Dewey L. Newman, Deputy Assistant Secretary for Student Financial Assistance, to W.N. Kirby, Commissioner of Education, Texas Education Agency (July 17, 1988), *reprinted in* Addendum to the Brief of Appellee Secretary of Education, at 2–3; Letter from Kenneth D. Whitehead, Acting Assistant Secretary of Education, to Congressman Stephen J. Solarz (May 19, 1988), *reprinted in* Joint Appendix, at 601–03. The letters state (without apparent substantive variation) that:

> If a loan is not legally enforceable, it is not reinsurable by the Department, and the Department would not encourage or require a lender or guaranty agency to attempt to collect such a loan. As a legal matter, however, a student who borrows under the GSL program from a third party lender remains responsible for repaying the loan even if the school closes, unless a relationship exists between the lender and the school that would make the school's failure to render educational services a defense to repayment of the loan to the lender. This kind of relationship can arise when the lender makes the school its agent for certain functions in the loan making process. The Department has termed such an agency relationship an "origination relationship."

> As you are no doubt aware, [suits have been filed challenging the enforceability of certain student loans]. If the court finds that the school acted as an agent of the lenders and determines that the loans, for

---

113 S.Ct. 2173, 2178, 124 L.Ed.2d 402 (1993) (citation omitted).

**21.** The principles announced in *Morton v. Ruiz,* 415 U.S. 199, 231–37, 94 S.Ct. 1055, 1072–75, 39 L.Ed.2d 270 (1974), are not to the contrary. In *Morton,* the Supreme Court laid down the rule that agencies must follow their own internal procedures "[w]here the rights of individuals are affected." *Id.* at 235, 94 S.Ct. at 1074. The Court retreated from the broadest reading of this holding in *Schweiker v. Hansen,* 450 U.S. 785, 789–90, 101 S.Ct. 1468, 1471–72, 67 L.Ed.2d 685 (1981), in which it refused to bind the Secretary of Health and Human Services to the internal rules set forth in a 13–volume Social Security Administration handbook. The Court reasoned that "the Claims Manual is not a regulation. It has no legal force, and it does not bind the SSA."

*Id.* at 789, 101 S.Ct. at 1471. Although *Schweiker* is terse, the decision appears to turn implicitly on the notion that the applicant's rights were not detrimentally affected by the agency's breach of its own internal rules. We recognized that the analysis under *Morton* turned on the underlying existence of an enforceable right in *National Latino Media Coalition,* 816 F.2d at 788 n. 2. *See also National Small Shipments Traffic Conference, Inc. v. ICC,* 725 F.2d 1442, 1449 (D.C.Cir.1984) (rejecting application of *Morton* where rule at issue "was not designed to protect either individual rights or wards of the federal government"). At issue in this case, in contrast to *Morton,* is the anterior question whether appellants have any enforceable rights in the Secretary's origination pronouncements.

that reason, are wholly or partially unenforceable against the borrowers, the Department would honor that determination, and would regard these loans, to that extent, as not covered by reinsurance, and would neither attempt to collect them nor expect guaranty agencies to collect them. The Compromise and Write–Off Procedures of 1989, intended as guidelines for guaranty agencies, state that "in the case of a loan that is made or originated by the school, the borrower's right to a refund amount owed by the school constitutes a defense to a corresponding amount of the loan." *See* Addendum to Appellants' Supplemental Brief, at 5. In this case and others, the Department has apparently conceded its longstanding "position" that "where there is an origination relationship between the school and the lender, the student's claims and defenses as to the school can be asserted as defenses to the loan contract, whether rights under the loan contract are being asserted by the lending bank, the guaranty agency, or the Secretary." Memorandum in Support of the Secretary of Education's Motion to Dismiss, *Armstrong v. Accrediting Council for Continuing Educ. & Training, Inc.*, 832 F.Supp. 419 (D.D.C.1993); *see also* Memorandum in Support of the Secretary of Education's Motion to Dismiss, at 14, *Jackson I*, 788 F.Supp. 1233 (D.D.C.1992).

Added to this mixture, however, is the fact that a 1990 proposal on borrower defenses, 55 Fed.Reg. 48,327 (1990), which would have "codif[ied the Secretary's] longstanding view" regarding defenses under circumstances of origination, was never adopted by the Department. Indeed, the Department expressly rejected the rule at 57 Fed.Reg. 60,304 (1992), explaining that "the Secretary has decided that it is not desirable at this time to prescribe in regulations a uniform Federal rule regarding borrower defenses that would preempt State law otherwise applicable to [GSL] programs. The Department believes that the determination of whether a defense under State law is available to a borrower requires a case-by-case assessment of whether individual State laws would frustrate accomplishment of the Federal objectives of the [GSL] program." *Id.*

Taking all of these factors into consideration, we conclude that, under the teaching of *Vietnam Veterans,* the Secretary has not sufficiently communicated an intention to be bound by his origination policy so as to create a legally enforceable right grounded in federal law. In the first place, the fragments of policy cited by appellants do not in and of themselves signify an intention to be bound. Indeed, the Secretary's letters appear to stand only for the relatively unremarkable proposition that the Secretary will not attempt the enforcement of unenforceable loans.[22] Defenses, which render loans unenforceable, inhere when there are certain relationships between lenders and the school; this kind of relationship "*can* arise" in circumstances of origination. This sort of murky, precatory language, like that at issue in *Vietnam Veterans,* militates against the conclusion that the letters were intended to confer a new, automatic defense or to recognize a longstanding, binding federal defense where there is an origination relationship. To be sure, the statement in the Compromise and Write–Off Procedures is not so equivocal; however, ensconced as it is in a letter to guaranty agencies (who would not be the beneficiaries of such a promise), it does not amount to more than a statement of policy.

Moreover, although the point is not in itself dispositive, we note that context strongly suggests that these letters were intended for the purpose of communicating the effect of defenses on the reinsurance program generally, rather than for the purpose of conferring new rights or defenses on individual students. The letters inform their readers of the impact of a court's determination that loans are unenforceable on the reinsurance program. They do not manifest an intention on the part of the Department to expand upon the available defenses; without elaboration they simply mention that where there is an origination relationship, the sort of rela-

**22.** To the extent that the letters stand for the notion that the Secretary will not attempt recovery on a loan that has been adjudicated unenforceable, there is serious question whether the Secretary has in fact surrendered *discretion* at all. *See United States v. Griffin,* 707 F.2d 1477, 1483 (D.C.Cir.1983).

tionship in which defenses apply "can arise." Much the same can be said for the Compromise and Write–Off Procedures, which are intended to provide guaranty agencies guidance on the circumstances under which they must enforce loans in the courts.

At bottom, we are left with the Department of Education's somewhat mysterious allusions to defenses in connection with its definition of "origination relationship." It is unclear from the bits and pieces presented to us that the Department intends a direct connection between the existence of an origination relationship and the imposition of defenses as a matter of federal law. Any doubts about this conclusion, however, dissipate completely with the recognition that the Department subsequently rejected any effort to create a uniform federal origination defense, preferring instead to rely on state-provided defenses under circumstances of origination. *See* 57 Fed.Reg. 60,304 (1992).[23] The paltry fragments suggesting the Department's intent, the amorphous language and unrelated context of the letters, and, finally, the Department's indication in 1992 that it preferred continuation of the regime of state defenses to the promulgation of a uniform federal rule all suggest to us the manifest impropriety of deeming the origination-for-bearance policy enforceable by appellants as a matter of federal law. We thus decline the invitation to do so; we would be supplanting the Department's evident intent with our own to do otherwise.

We find no need to assess the district court's findings with respect to summary judgment. We remand to the district court with instructions to dismiss the origination claim. We do so without prejudice to the assertion of state common-law agency claims relying upon the Secretary's origination definition in subsequent proceedings.

### III. Conclusion

For the foregoing reasons, we pass over the opportunity to render declaratory relief as to appellants' state-based claims at this juncture. As to the sole federal claim, we affirm the district court's result but do so on different grounds, resting on the conclusion that the Secretary of Education's origination policy does not confer an enforceable right on appellants. We therefore remand to the district court with instructions to dismiss this action.

*Remanded with instructions.*

---

**23.** The Secretary did, however, adopt a standardized "common note" containing the FTC Holder Rule notice clause in April 1993, and has required the new note to be used as of January 1, 1994.